Andrew N. Heine, Respondent-Appellant, v Joni C. Heine, Appellant-Respondent.

First Department, February 11, 1992

78

### APPEARANCES OF COUNSEL

*Myrna Felder* of counsel *(Raoul Lionel Felder, P. C.,* attorney), for respondent-appellant.

*Joan L. Ellenbogen* of counsel *(Marcia C. Goldstein* and *Kenneth Ludman* with her on the brief; *Ellenbogen & Goldstein, P. C.,* attorneys), for appellant-respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Married on October 28, 1968, she for the first time, he for the second, when they were 27 and 38 years of age, respectively, and he was a partner in a medium-sized New York City law firm and she a teacher at Hunter College pursuing a doctorate in sociology at Columbia University, the parties separated in November 1985, when the husband left the marital home. At the time of the marriage, the husband had three children, ranging in age from nine to twelve, from his prior marriage. There is one child of the marriage, a son, born on October 19, 1972. One month after separating, the husband commenced the instant divorce action.

In May 1969, one-half year after the marriage, the parties purchased, at a cost of $267,500, financed by two mortgages totaling $213,000 and a down payment of $54,500, a five-story townhouse located at 441 East 57th Street in Manhattan, title to which was taken solely in the husband's name so that, as he explained at the time, he would be better able to borrow against it. At the time of purchase, the townhouse consisted of three apartments, one on the first floor, and two duplexes, one, on the fourth and fifth floors, in disrepair and badly in need of renovation. The fourth and fifth floor renovations, which the wife arranged and supervised, included replacing the windows and all electrical appliances, sanding, scraping and refinishing the wooden floors and painting the walls. In October 1969, almost six months after the purchase of the townhouse, the renovations of the upper duplex were completed and the parties took occupancy.

In 1970, when the second and third floor duplex became vacant, it too was renovated, again under the wife's supervi-

sion. A new stairway between the second and third floors, as well as a new kitchen, was installed, a new front room added and the dining room, kitchen and bathrooms refurbished. Once the work was completed, the parties moved into the second and third floor duplex. Two years later, in 1972, when the first floor became vacant, the parties decided to create a triplex. The renovation, which included gutting the entire first floor, extending it 10 feet and installing an interior stairwell connecting all three floors, was again overseen by the wife, who, in addition, since at least one or more of the townhouse apartments was always rented, acted as the on-site landlord and caretaker.

It was the wife, who, throughout the marriage, undertook the major responsibility for taking care of the family's domestic and social needs. While the husband pursued his career, the wife took care of their son and his developmental needs. She brought him to his doctor's appointments and nursed him when he was ill; she shopped for his clothing, selected his schools and attended his various functions thereat. The wife also maintained a close relationship with the husband's children from his first marriage. She telephoned them daily, spent almost every weekend with them, arranged birthday parties and family vacations for them and was always available to counsel them in their personal or school problems.

The wife assisted the husband in entertaining his law clients; she had dinner or cocktail parties at the townhouse on an almost weekly basis. In addition, approximately four times a year she arranged larger gatherings, including an annual Christmas party, for as many as 90 guests. She was solely responsible for planning these events.

After the marriage, the husband joined a much larger New York City law firm as a named partner. His earnings increased substantially throughout the marriage and the parties enjoyed an extremely lavish lifestyle. In addition to the townhouse, which, as stipulated, has a value of $2,500,000, they acquired a 73-acre estate in North Salem, New York, valued at $1,800,000, as well as various other investment and security interests. At the time of trial, in late 1988, the husband was both chief executive officer, earning approximately $300,000 per year, of a large corporate concern and counsel to yet another law firm, earning approximately $150,000 per year, for a total annual income of $450,000.

The wife, on the other hand, left her teaching position at

Hunter College one year after the marriage and joined the faculty at Columbia Presbyterian Hospital Behavioral Science Department, teaching a seminar one day a week. She remained on the Columbia Presbyterian faculty for approximately seven years. As a result of her family responsibilities, however, the wife was unable to continue her doctoral studies at Columbia full time and had to withdraw, transferring to a less demanding program and receiving her PhD in 1981. At the time of trial, the wife was teaching a course, which she had also taught in the fall 1987 semester, at New York University Graduate School of Art Administration. She had, at that time, $60,000 in liquid assets, an undivided one-half interest in the North Salem property, a one-eighth interest in an investment known as Thurcon Development Company and a horse; the remaining marital assets were in the husband's name.

After 11 days of trial on the issues of child custody, support, maintenance and equitable distribution, the husband withdrew his complaint and reply to the wife's counterclaim for divorce, and the wife was granted a divorce on the ground of cruel and inhuman treatment. A judgment thereon was entered on April 25, 1989. Thereafter, on August 1, 1989, a supplemental judgment of divorce was entered with respect to the ancillary issues. The wife was awarded a distributive award of $2,587,372, representing one half of the net marital estate less $62,700 in her name. The judgment provided that $750,000 was to be paid upon entry thereof with the remainder, at 9% interest, payable from the proceeds of the sale of the townhouse, which was to be sold on or before July 1, 1990, with the interest on the unpaid sum payable each and every month on the first day thereof, commencing with the date of entry of the judgment. In addition, the husband was to receive a credit for one half of the capital gains tax actually paid during the year of sale and for any sums paid for maintenance of the premises after January 1, 1990.

The wife moved to resettle the supplemental judgment of divorce, arguing that the court, having determined the wife's interest in the townhouse to be 38.5%, erred in permitting the husband to reduce the amount he was to pay the wife by 50% of the capital gains tax paid during the year of sale. The wife alternatively argued that the husband should be directed to transfer title to 38.5% of the townhouse to her and both parties required to pay the capital gains tax incurred upon the sale of the property. The court granted the wife's motion

in part, limiting the husband's credit for capital gains tax paid during the year of the sale to 38.5% of the lesser of $2.5 million, i.e., the townhouse's agreed-upon value, or the actual selling price. Additionally, the court gave the wife the option of having the husband transfer to her a 38.5% interest in the townhouse, upon the sale of which she would receive 38.5% of up to $2.5 million of the net proceeds, without any deduction for the payment of capital gains tax. The wife appeals and the husband cross-appeals from the resettled supplemental judgment.

A major issue on appeal, as it was at trial, is the extent to which the townhouse constituted marital or separate property. The husband testified that he paid the down payment from the $300,000 he realized from the sale of his General Artists Corporation stock, which he had acquired before the marriage. The IAS court found for the husband on this point. In so finding, the court stressed the absence of testimony "as to any other source for the money". The wife had testified that she did not know where the money for the down payment had come from.

Domestic Relations Law § 236 (B) (1) (c) defines marital property as "all property acquired by either or both spouses during the marriage and before * * * the commencement of a matrimonial action, regardless of the form in which title is held". Since property acquired during the marriage is presumptively marital (*Lischynsky v Lischynsky*, 120 AD2d 824, 826), the burden of proof is with the party who claims that such property is separate. (*See, Raviv v Raviv*, 153 AD2d 932, 933.) Thus, it was the husband's burden to show that he used separate property to acquire a marital asset.

While the husband could not remember how many shares of General Artists stock he owned and had no records of the transaction, such as a brokerage statement, sales slip or tax return, it is important to note that the sale had taken place approximately 20 years before. His testimony that he had substantial assets and income at the time of the marriage went unchallenged. It is undisputed that the wife had neither. Nor, contrary to the wife's arguments, was the husband's testimony on this point significantly impeached.

Finally, it is worth noting that the townhouse was purchased approximately six months after the marriage, lending further support to the husband's claim that his separate property provided the source of funds for the down payment.

In fact, this circumstance fairly compels the conclusion that the down payment came from his premarital assets. Thus, although the husband's claim of separate property is based, in large part, upon his own uncorroborated testimony, we cannot say that the IAS court's finding on this point was against the weight of the credible evidence. *(See, e.g., Capasso v Capasso,* 129 AD2d 267, 282, *lv denied* 70 NY2d 988.)

Based on this finding, the court awarded the husband 23% of the townhouse's agreed value of $2,500,000 as separate property. It is undisputed that, at the very least, the court erred in calculating the husband's contribution to the purchase of the townhouse at this percentage. In its decision, the court noted that the purchase price of the townhouse "was $276,500 and the two mortgages aggregated $213,000." On the basis of these findings, the down payment would have been $63,500. The record, however, clearly shows that the purchase price was $267,500, not $276,500. By apparently transposing a purchase price of $276,500 for $267,500, the court erroneously increased the amount of the down payment from $54,500 to $63,500, which is approximately 23% of $276,500. $54,500 is only slightly more than 20% of $267,500.

More importantly though and in any event, while the husband sustained his burden of showing that a percentage of the original purchase price of the townhouse was paid with his separate property, the IAS court erred in awarding him a like percentage of the townhouse's current value. Clearly, the appreciation was not attributable to the down payment but to the extensive renovations supervised by the wife and paid for with marital funds, mortgage payments made with marital funds and market forces, and the award of 23% to the husband of the current value of the townhouse as separate property, aside from being mathematically incorrect, is improper as a matter of law. The husband should only be credited with the initial investment of $54,500. Where a spouse contributes separate property towards the creation of a marital asset, he or she is entitled to a credit for the amount of property contributed. *(See, e.g., Lolli-Ghetti v Lolli-Ghetti,* 165 AD2d 426, 432; *Coffey v Coffey,* 119 AD2d 620, 622.) Transmuting that contribution into a percentage and applying the percentage to an appreciated asset to which it bore no relationship constituted manifest error.

Thus, crediting the husband with the $54,500 down payment from his separate property and awarding each of the parties a 50% interest in the $2,500,000 stipulated value of

the townhouse would leave the husband with a $1,277,250 interest and the wife with one valued at $1,222,750, as compared to the IAS court's award of $1,605,000 and $895,000, respectively. The resettled judgment should be amended to provide that the husband be credited with 50% of the capital gains paid by him as a result of the sale of the townhouse.

■ The husband's claim that the court erred in failing to find a separate property interest in his favor in the parties' North Salem home should be rejected. He failed to show that the property, acquired 13 years after the marriage, was purchased and renovated with the proceeds from the sale of Mallory Randall stock, previously exchanged for Mallory Randall bonds acquired prior to the marriage. Indeed, the husband's own tax returns refuted his testimony in that regard. His 1981, 1982 and 1986 returns showed that the Mallory Randall securities were not acquired until 1978. The IAS court property rejected the claim.

The wife claims that the IAS court erred in denying her a share of the appreciation, subsequent to the commencement of this action, of that portion of the husband's shares of American Bakeries Company stock which is marital property. In 1988, prior to trial, the husband sold his American Bakeries stock at a higher price than its value at the commencement of the action. The IAS court, however, refused to consider such postcommencement sale and denied the wife any portion of the appreciation, holding that, because the husband, subsequent to the separation, had made a large additional investment in American Bakeries and rolled over the shares which were marital property, none of the proceeds from the 1988 sale could be attributed to appreciation of marital assets as a result of "market influences".

At the time this action was commenced, in December 1985, the husband owned a total of 10,750 shares of American Bakeries stock, which was then publicly traded. All such shares were thus marital property and their aggregate value of $282,889 as of December 31, 1985 was included in the assets equitably distributed by the court. In 1986, the husband had become one of 14 to 20 directors of American Bakeries. When the company subsequently went private, the husband redeemed a portion of the 10,750 publicly traded shares and exchanged the 6,500 share balance, valued, according to the wife's accountant, at $270,000, for shares in the private company. As a member of the board of directors, the husband was given the option, which he exercised, of investing in the

private company, and he purchased additional shares at a cost of $1,230,000. These additional shares were, of course, the husband's separate property, to which the wife has not asserted any claim.

As a result of these two transactions, the husband, in December 1986, held a total of 5,625 shares at a cost of $1,500,000 ($270,000 [marital shares] plus $1,230,000 [postcommencement shares]), of which approximately 18% was acquired in the exchange of the original marital shares. Of the 5,625 shares, the husband conveyed to himself as trustee 141 shares to each of four trusts he created, one for each of his children from his first marriage and one for the child of the instant marriage, for a total of 564 shares.

In December 1988, when American Bakeries merged with another company, its shareholders received $132,500,000 of which, according to the wife's accountant, the husband received $7,453,125 for the 5,625 shares. Additionally, the husband received dividends of $1,422,618.75 ($1,279,977.51 personally and $142,641.24 as trustee) at three separate intervals in 1988 on the 5,625 shares. Thus, from dividends and the sale of his American Bakeries shares the husband realized $8,875,743.75, of which, according to the wife, the original 18% marital portion is $1,597,633.88. Since, however, as the wife's accountant recognized, $282,889, representing the value of the shares owned by the husband at the commencement of the action in December 1985, was equitably distributed by the court, that amount must be deducted from the $1,597,633.88, leaving, according to the wife, the sum of $1,314,744.88 as the undistributed marital portion of the postcommencement moneys received by the husband from the original marital shares of American Bakeries. Of that sum, the wife claims entitlement, in accordance with the IAS court's 50% apportionment, to $657,372.44.

In resisting the wife's claim to a distributive share of the postcommencement dividends and proceeds from the sale of the husband's American Bakeries stock, the husband makes several arguments. As a matter of procedure, he cites an October 17, 1988 pretrial order fixing December 1, 1985, the date of commencement of the action, as the valuation date of all marital assets and liabilities, except for certain assets not here relevant. That order, however, is not as rigid as the husband would have it. It specifically provided that "liabilities arising and assets obtained after those dates may be considered if relevant at the time of trial." The substantial postcom-

mencement increase in value of the marital portion of the husband's American Bakeries shares, accomplished by the postcommencement exchange of public shares, a portion of which were marital, for private shares, is clearly relevant for valuation purposes.

The husband's substantive argument, i.e., that his American Bakeries stock was an active asset, which should be valued as of the date of the commencement of the action, is, however, well taken. As he correctly argues, it is the nature of the particular asset that determines the date of valuation. Recognizing that there is no fixed rule mandating a particular valuation date *(Wegman v Wegman,* 123 AD2d 220, 234), the Legislature amended the Domestic Relations Law in 1986 to include the provision, "[t]he valuation date or dates may be anytime from the date of commencement of the action to the date of trial." (§ 236 [B] [4] [b].) While not applicable to this matter, which was commenced before its effective date, the amendment is nonetheless reflective of the flexibility inherent in the fixation of values in an equitable distribution award. Assets that are passive, that is, whose values are affected by outside influences such as inflation or market forces, should generally be valued as closely as possible to the date of trial so as to avoid a windfall to the titled spouse and injustice to the other if the asset has increased in value. *(See, Greenwald v Greenwald,* 164 AD2d 706, 716, *lv denied* 78 NY2d 855.)* On the other hand, assets whose values are affected by the active participation of the titled spouse should generally be valued as of the commencement of the action to reward that party's postcommencement efforts, to which the nontitled spouse did not contribute, either directly or indirectly. *(Supra.)*

Although the point could have been better developed at trial, a reading of the record reveals that the husband, a director of American Bakeries, with a small coterie of other directors and certain employees, numbering at most 20, made a strategic decision in October 1986 to take the company private. As part of that transaction, the husband availed himself of the option to convert his publicly traded shares for private shares. The husband's actions with respect to these transactions can hardly be characterized as passive, as the wife argues. Rather, they represent an active and direct involvement in a corporate and investment decision which dramatically affected the legal nature of the multi-million dollar entity. Thus, quite apart from the October 17, 1988 order, which, as noted, is not controlling, we find that the

valuation of the marital shares of the husband's American Bakeries stock, an active asset, was properly fixed at December 1, 1985.

Included in the husband's various investments were his limited partnership interests in Cable Entertainment VI and Cencom of Missouri II, both of which were involved in the cable industry and constitute marital property. The IAS court determined that the commencement date of the action, December 1, 1985, was the appropriate valuation date for these assets. Based upon his schedule K-1 for the year ending December 31, 1985, the husband owned .630570% interest in Cable Entertainment. The husband's capital account showed a $31,300 balance, which was the value placed on the asset by the IAS court. At trial, it was shown that in 1987 the husband received $85,000 from the sale of his Cable Entertainment interest. The husband's schedule K-1 for the year ending December 31, 1985 also showed that he held a 1.0607% interest in Cencom, with a capital balance on that date of $94,317, which was the value placed on the asset by the IAS court. By letter of October 12, 1987, Cencom extended to all its limited partners the opportunity to sell their limited partnership interests at $92,737 per unit of interest. Based upon the $92,737 per unit sales price, the wife's accountant valued the husband's 1½-unit interest at $139,105.

 In our view, the IAS court erred in ignoring this undisputed valuation evidence showing the actual sales value of the husband's limited partnership interests and using, instead, the capital accounts as shown on his schedule K-1. Capital accounts do not represent fair market value but actual sales or sale offers do. The postcommencement proof of the values of these two clearly passive investments showing actual sales prices should have been applied to determine the value of the husband's limited partnership interests and we modify accordingly to so provide.

The final point regarding valuation is raised by the husband, of whose various tax shelters six were in real estate partnerships. The IAS court assigned a value to each of these partnerships as of the commencement date of the action. The husband argues that these assets should have been valued as of the date of trial in accordance with the court's pretrial order which excluded real estate assets from the December 1, 1985 valuation date. The husband claims that since his schedule K-1 for the period ending December 31, 1987, the date closest to trial, showed a negative balance, which should have

been subtracted from the total value of these partnerships, the court overvalued the marital property by $411,233.

■ This argument is without merit since it ignores an essential part of the record. Most significantly, the husband, who began filing separate income tax returns in 1986 alone enjoyed the tax write-offs created by these investments between the date of commencement of the action and the trial. Furthermore, by taking these tax-saving benefits in 1986 and 1987, the husband, by the date of trial, had reduced the amount of his capital account in each of these tax shelters. Clearly, the husband cannot have it both ways, that is, all the tax savings for the two years in question and a distribution which reflects a substantial reduction as a result of the write-offs taken by him. Since the wife did not share in any of the tax-saving benefits taken by the husband from these tax shelters in 1986 and 1987, a factor which the IAS court expressly took into account, the assets were properly valued as of the date of the commencement of the action.

During the marriage, the husband acquired a 33⅓% limited partnership interest in Mira Mesa Canyon Associates, Ltd., which owned a group of apartment buildings in San Diego, California. In valuing this marital asset the IAS court rejected both parties' calculations and, without any analysis or explanation, substituted its own, valuing it at $600,000. On appeal, both parties challenge the court's valuation and assert that it is without a rational basis.

According to the wife's expert, the apartment buildings owned by Mira Mesa had an appraised value as of November 25, 1988 of $8,450,000, a figure which not even the husband disputed. Indeed, he testified that Mira Mesa's partners agreed to sell the apartment buildings for $8,300,000. Based upon Mira Mesa's December 31, 1985 financial statement, the buildings had a book value of $5,720,252 and the land a book value of $1,500,000, for a total book value of $7,220,252. Since accounting and tax principles require that an improvement be shown at cost less depreciation and land at cost, the wife's expert increased the December 31, 1985 balance sheet's book values of buildings and land to reflect their market values. Inasmuch as the December 1988 sales price of the apartment buildings and land was $8,300,000, the increase over book value was $1,079,748, of which the husband's 33⅓% share was $359,916. To determine the total value of the husband's interest in Mira Mesa as of December 1988, the wife's expert then added to his share of the increase $356,147, the amount

of the husband's capital account in Mira Mesa, as shown in his schedule K-1, as of December 31, 1985. Thus, by adding the husband's capital account to his share of the increase in fair market value over book value, the total value of the husband's interest in Mira Mesa was $716,063, not $600,000 as found by the IAS court, which should be divided equally between the parties.

The husband, who failed to call any witnesses, expert or otherwise, to value his interest in Mira Mesa, attempts, on appeal, to discredit the analysis of the wife's accountant with bald conclusory allegations and his own self-serving claim that he will eventually suffer a loss of approximately $375,000 on the sale of his Mira Mesa interest. Without any detailed explanation as to how the husband's projected loss was arrived at or of its impact on the value of the asset, then under contract to be sold, his claim must fail. In contrast, the wife's experts presented a cogent and rational analysis of the value of the husband's interest in Mira Mesa, which should have been accepted. We modify accordingly.

The husband also argues that the court improperly valued at $487,500 the parties' interest in Thurcon Development Company, a limited partnership which owns a building, subject to an outstanding mortgage of $6,600,000, on East 22nd Street in Manhattan, based on a May 1986 appraisal of the building at $10,500,000 by Thurcon's independent real estate appraiser in connection with a refinancing of the mortgage. In support of his argument, the husband goes outside the record to state that this court "can take judicial notice * * * that this entity is now in bankruptcy." As a rule, posttrial changes in value should not be considered in fashioning equitable distribution awards. *(See, Greenwald v Greenwald,* 164 AD2d, *supra,* at 721-722.) The husband, not an expert in real estate values, testified that the value of Thurcon's building at the time of trial was "probably" $9,000,000. The IAS court properly rejected the husband's valuation and based its determination on the appraisal of a disinterested professional.

The husband argues that the IAS court erred in failing to order a distribution of the marital assets in kind. Such a distribution would, he asserts, avoid the unfair burden which has been imposed on him to maintain the marital assets pending liquidation, absorbing any loss in value and paying interest on their illiquid values. The record discloses that the court gave the parties every opportunity to present to it

whatever method they deemed appropriate to effectuate its distributive award to the wife, even inviting an "in kind" distribution. The husband, for reasons best known to him, chose otherwise. He submitted a supplemental judgment of divorce providing for a cash distributive award to the wife, representing one half of the net marital estate, less the $62,700 in her name, carefully selected those assets he wished to be distributed in kind to her, i.e., antiques, household furnishings and her horse, and requested that he be awarded "sole title to the remainder of the marital property", specifying that the North Salem property remain his. Clearly, he wanted to keep for himself substantially all the marital assets and have the townhouse, which is the wife's residence, sold. The husband cannot now argue for a modification of the method of distribution which he himself fashioned merely because, in hindsight, he believes a different method would be more advantageous to him.

As a corollary to his argument that the marital assets should have been distributed in kind, the husband asserts that the IAS court failed to take into account the tax consequences with respect to the marital assets, especially the tax shelter partnerships. In point of fact, the court did consider the tax consequence evidence introduced at trial. In rejecting the husband's request for a credit for taxes, the court concluded that the tax impact evidence offered by the husband's accountant was too speculative to support such a credit. In so finding, the court did not err. *(See, Schanback v Schanback,* 159 AD2d 498, 499-500, *lv denied* 75 NY2d 703.)

We have considered the other arguments raised in these cross appeals and find that they are without merit.

Accordingly, the resettled supplemental judgment of the Supreme Court, New York County (Shirley Fingerhood, J.), entered July 18, 1990, should be modified, on the law and on the facts and in the exercise of discretion, to provide that the wife is entitled to a 50% share of the $2,500,000 stipulated value of the townhouse less the husband's credit of $54,500 with respect to the down payment or $1,222,750; that the distributive award be recalculated on the basis thereof as well as on the value of the husband's limited partnership interests in Cable Entertainment and Cencom and Mira Mesa determined herein and that the husband be directed to pay the distributive award as recalculated, less a credit for 50% of the capital gains tax paid by the husband when the townhouse is

sold and, except as thus modified, affirmed, without costs or disbursements.

CARRO, ROSENBERGER, KUPFERMAN and RUBIN, JJ., concur.

Resettled amended judgment, Supreme Court, New York County, entered on July 18, 1990, modified, on the law and on the facts and in the exercise of discretion, to provide that the wife is entitled to a 50% share of the $2,500,000 stipulated value of the townhouse less the husband's credit of $54,500 with respect to the down payment or $1,222,750; that the distributive award be recalculated on the basis thereof as well as on the value of the husband's limited partnership interests in Cable Entertainment and Cencom and Mira Mesa determined herein and that the husband be directed to pay the distributive award as recalculated, less a credit for 50% of the capital gains tax paid by the husband when the townhouse is sold and, except as thus modified, affirmed, without costs or disbursements.