■ JAMES H. PULVER, Appellant, v SUZANNE M. PULVER, Respondent. [837 NYS2d 369]—

Spain, J. Appeals from two orders of the Supreme Court (Doyle, J.), entered April 15, 2005 in Ulster County, ordering, inter alia, equitable distribution of the parties' marital property, upon decisions of the court.

Plaintiff and defendant were married in July 1992 and have three children (born in 1993, 1995 and 1997). Prior to their marriage, defendant and her siblings were given an interest in

New York businesses owned by her father. In 1990, defendant moved to New York to be closer to her family and began working in the family businesses and plaintiff moved to New York to join her soon thereafter. On the day before their wedding, the parties—under the supervision of their respective attorneys—duly executed and acknowledged separate but identical prenuptial agreements at two separate locations.

Just prior to their marriage, defendant used separate funds toward the purchase—in her own name—of what became the marital residence in the Town of Saugerties, Ulster County. Defendant's parents loaned her $30,000 toward the down payment and closing costs on the home. Although the mortgage remained in defendant's name, she subsequently deeded the residence to plaintiff, who transferred the property to the parties jointly. During the marriage, defendant spent $150,000 of her separate funds for improvements to the residence, and plaintiff made the mortgage payments until the commencement of this action.

In August 1995, defendant's family's businesses, where she was employed, were sold for $12.5 million and she placed her share of those funds, approximately $2.5 million, in a separate account. Meanwhile, plaintiff began to manage most of the investments in defendant's family's sizable portfolio and used $40,000 of marital assets to form his own company, Lockwood Financial Services.

Plaintiff commenced this divorce action in July 2002 and the parties ultimately agreed to dissolve the marriage on the ground of defendant's constructive abandonment; a trial was subsequently held to determine how their assets would be distributed.[1] After hearing proof with respect to the parties' prenuptial agreement, Supreme Court, by decision and order, determined that it was valid and enforceable. Upon the completion of the trial, the court issued a second decision and order which, among other things, ordered plaintiff to pay monthly child support of $2,175 and child support arrears, directed the parties to each pay half of the cost of the children's unreimbursed health care expenses and private schooling, determined that neither party was entitled to spousal maintenance, awarded defendant 70% of the marital residence after finding it to be marital property, and required plaintiff to pay defendant 50% of the value of his business. Plaintiff now appeals.

---

1. In January 2003, by temporary order, Family Court, Ulster County, ordered plaintiff to pay $1,700 in monthly child support. However, by the time of the November 2004 trial, plaintiff was $18,900 in arrears. In June 2003, Family Court granted sole custody of the parties' children to defendant.

Initially, there is ample support in the record for Supreme Court's determination that the parties' prenuptial agreement was properly executed and enforceable. A duly executed prenuptial agreement will be considered valid and binding unless the contesting party can establish that he or she was induced by fraud, overreaching or duress attributable to the party seeking enforcement (*see Matter of Greiff*, 92 NY2d 341, 344 [1998]; *Costanza v Costanza*, 199 AD2d 988, 990 [1993]). Evidence demonstrating "concealment of facts, misrepresentation or some form of deception" is necessary to establish fraud (*Matter of Phillips*, 293 NY 483, 491 [1944]); however, "a failure to disclose does not, standing alone, constitute fraud or overreaching sufficient to vitiate" a prenuptial agreement (*Panossian v Panossian*, 172 AD2d 811, 813 [1991]).

Here, plaintiff first asserts that although both parties signed the agreement on the same day, they signed and acknowledged—before notaries—two separate documents, at different locations, and when they each signed their respective copy, the line for the other party's signature was blank. Indeed, the fact that the agreement was signed by the parties at separate locations does not render it invalid; "a binding agreement may be assembled from more than one writing, even if all are not signed by the party against whom enforcement is sought" (*Nolfi Masonry Corp. v Lasker-Goldman Corp.*, 160 AD2d 186, 187 [1990], citing *Crabtree v Elizabeth Arden Sales Corp.*, 305 NY 48, 54-55 [1953]; *see Raj Jewelers v Dialuck Corp.*, 300 AD2d 124, 126 [2002]). Here, although the agreements were signed at separate locations, they are identical and plaintiff conceded that he understood beforehand that even though neither of the documents would be signed by both parties, their terms were binding on both parties.

Similarly unpersuasive is plaintiff's claim that the prenuptial agreement was unenforceable as defendant inadequately disclosed her financial standing prior to its execution. Notably, in the signed agreement, the spaces provided for the amount of stock that defendant held in each of the family businesses were left blank. However, plaintiff testified that he was aware when signing the agreement that it did not set forth the number of defendant's shares in the family businesses but was not concerned by that omission, and that defendant's financial status had made no difference to him before the marriage and that, even if she had disclosed her financial status, it would not have changed his decision to sign the agreement. Further, the record indicates that plaintiff—an experienced stockbroker who had attended meetings of the companies' executive committee

during the period leading up to the agreement—had a thorough knowledge of defendant's finances before signing the agreement. Finally, since he entered into the agreement with the assistance and advice of his own attorney, plaintiff may not now "complain that his . . . interests were not adequately safeguarded" (*Price v Price*, 289 AD2d 11, 13 [2001]). Indeed, ample evidence supports the conclusion that the prenuptial agreement is valid and enforceable.

We also find support in the record for Supreme Court's calculation of plaintiff's child support obligation. The court determined plaintiff's income for child support purposes to be $90,000, applied the statutory percentage to this income and found plaintiff's monthly child support obligation to be $2,175. Plaintiff initially argues that Supreme Court did not follow the statutory requirement as it did not exclusively rely on his most recent tax return when calculating his parental income (*see* Domestic Relations Law § 240 [1-b] [b] [5] [i]). Plaintiff claims that this mistake was egregious as his recent tax returns consistently indicated his income to be much lower than $90,000. However, the court may impute income from any source that is not reported on an income tax return (*see* Domestic Relations Law § 240 [1-b] [b] [5] [iv]), and such imputed income may be attributed to a party so long as the court articulates the bases for the imputation and its calculations are supported in the record (*see Matter of Calabrese v Johnston*, 274 AD2d 971, 971 [2000]). Here, the court noted that plaintiff's 2003 income tax return listed his income as $77,278,[2] but additionally observed that the 2004 business ledger of plaintiff's company showed his income for the first 10 months of 2004 to be $94,087.16. The court also found that plaintiff took upwards of $42,700 from his business in 2004 to pay a number of personal expenses. Consequently, there was sufficient record support and explanation for imputing additional income to plaintiff and setting his income for child support purposes at $90,000.

Plaintiff next claims that Supreme Court failed to sufficiently articulate why it would not depart from the given statutory percentages when evaluating his income over $80,000 for child support purposes (*see* Domestic Relations Law § 240 [1-b] [c] [3]; [f]). However, the court adequately stated its rationale, indicating that it took into account, among other things, the children's standard of living and their level of activities. Similarly unpersuasive is plaintiff's claim that the court erred in requiring him to pay 50% of the cost of the children's private

---

2. Notably, plaintiff's 2002 tax return indicates his income to be only $55,756.

schooling, asserting that such a mandate was improper as he never agreed to send his children to St. Mary's of the Snow, a private parochial school. The court's finding, however, that this choice of schooling was jointly decided by both parties is also supported in the record.

Plaintiff next argues that Supreme Court failed to determine the combined parental income before applying the child support percentage contrary to Domestic Relations Law § 240 (1-b) (c) (1), (2). Indeed, the court did not state defendant's parental income and appears to have merely applied the correct child support percentage of 29% to plaintiff's assessed income of $90,000. Since the statutory percentages should be applied only to the combined parental income (*see* Domestic Relations Law § 240 [1-b] [b] [3], [4]), the court should have added defendant's income to the $90,000 attributable to plaintiff before calculating his prorated child support obligation. However, implicit in the court's decision is that defendant's income for child support purposes was also $90,000; and the record amply supports this determination.[3] Accordingly, based upon a combined parental income of $180,000, the court properly calculated plaintiff's monthly child support obligation to be $2,175 after applying the child support percentage and prorating the results (*see* Domestic Relations Law § 240 [1-b] [b], [c]).

We next reject plaintiff's assertion that Supreme Court should have considered, prior to assessing his income over $80,000, that he was left impoverished when defendant's family withdrew its investments from his control (*see* Domestic Relations Law § 240 [1-b] [f] [10]; [g]). Given the evidence, however, that plaintiff's business was still lucrative and that he continued to lead an expensive lifestyle following the parties' separation, his argument is unpersuasive.

We also reject plaintiff's assertion that Supreme Court erred in valuing his individual retirement accounts as of the date of trial. So as to avoid a windfall to the titled spouse and an injustice to the other, "where increases to a marital asset are passive, that is, affected by outside market influences rather than the actions of the titled spouse, the asset should be valued as closely as possible to the date of trial" (*Harrington v Harrington*, 300 AD2d 861, 864 [2002]; *see Soule v Soule*, 252 AD2d 768, 771 [1998]; *Heine v Heine*, 176 AD2d 77, 87 [1992], *lv denied* 80 NY2d 753 [1992]). Here, plaintiff, on direct examination, testified that the market was a factor in the increase and conceded on cross-examination that the increase was "strictly a

---

**3.** For example, Supreme Court determined that the parties should equally split the child support add ons.

result of market forces." In all, plaintiff failed—despite his expertise in that field—to demonstrate that he actively managed the individual retirement accounts during the pendency of the action. Accordingly, no error occurred.

As to the distribution of the marital residence as marital property, we find ample support in the record for Supreme Court's choice of expert opinions in setting the value of the marital residence at $350,000, the issues of the quality of the proof and credibility having been resolved in defendant's favor by the trier of fact (see *Walasek v Walasek*, 243 AD2d 851, 853 [1997]; *Holihan v Holihan*, 159 AD2d 685, 686 [1990]). We also reject plaintiff's argument that the court unfairly distributed the marital residence. It is well settled that a party is entitled to a credit for any contribution of separate property used in the purchase or improvement of the marital dwelling (see *Stots v Daniels*, 22 AD3d 413, 413-414 [2005]; *Gonzalez v Gonzalez*, 291 AD2d 373, 374 [2002]; *Strang v Strang*, 222 AD2d 975, 977 [1995]; *Mink v Mink*, 163 AD2d 748, 749 [1990]; *Lord v Lord*, 124 AD2d 930, 931 [1986]; *Cunningham v Cunningham*, 105 AD2d 997, 998-999 [1984]). Here, defendant purchased the residence in her own name with her separate funds for the down payment and closing costs totaling $47,301, a sum which included a $30,000 loan to her from her parents which they later forgave as a gift. Notably, despite the conflicting testimony regarding that gift, the loan clearly was made to defendant only and our review of the testimony supports the court's determination that it was subsequently gifted to her alone and not to both parties.

Moreover, we cannot say that Supreme Court abused its discretion in awarding plaintiff only 30% of the balance of the value of the residence, a decision based on defendant's expenditure of upwards of $150,000 of her separate funds to renovate and improve the marital residence. While defendant may have been entitled to a full credit for these improvements (see *Strang v Strang, supra* at 977; *Lord v Lord, supra* at 931; *Cunningham v Cunningham, supra* at 998-999), the court, within its broad discretion, reasonably awarded defendant 70% (20% more than a 50/50 split) of the balance of the value of the residence.

There is also support in the record for awarding a credit to defendant for a portion of the $74,564.56 that she paid from her own funds for the carrying charges—mortgage, taxes, maintenance—on the residence from July 2002, when plaintiff ceased making payments on the mortgage (see *Cunningham v Cunningham, supra* at 998-999). In light of the 70/30 split in distributing the marital residence, however, defendant's credit

for the carrying charges should be limited to 30% instead of the 50/50 split awarded by Supreme Court.

We also find merit in plaintiff's contention that Supreme Court improperly directed him to pay defendant 50% of the $40,000 in marital property used to start his business, Lockwood Financial Services. In order to avoid "double counting," seed money voluntarily contributed from marital funds to help one of the parties create a new business should not be reimbursed during distribution if the value of that business is equitably distributed (*see Garvey v Garvey*, 223 AD2d 968, 971 [1996]). Thus, as defendant received a 50% share of plaintiff's business in equitable distribution, the court erred in directing plaintiff to repay defendant $20,000, i.e., half of the $40,000 of marital property used to start his business.

We have considered plaintiff's remaining contentions, including Supreme Court's denial of maintenance, and find them to be without merit.

Cardona, P.J., Mugglin and Rose, JJ., concur. Ordered that the orders are modified, on the law and the facts, without costs, by reversing so much thereof as (1) credited defendant with 50% of the $74,564.56 she expended with respect to the marital residence during the pendency of the action, and (2) directed plaintiff to pay defendant $20,000 in marital assets used to start plaintiff's business; defendant is entitled to only a 30% credit for the moneys she expended with respect to the marital residence; and, as so modified, affirmed.

