■ STEVEN SIMKIN, Appellant, v LAURA BLANK, Respondent.
[915 NYS2d 47]—

Order, Supreme Court, New York County (Saralee Evans, J.),
entered January 5, 2010, which granted defendant's motion to
dismiss pursuant to CPLR 3211, reversed, on the law, without
costs, the motion denied and the complaint reinstated.

Initially, we note that on a CPLR 3211 motion to dismiss,
"the court must afford the pleadings a liberal construction, take
the allegations of the complaint as true and provide plaintiff the
benefit of every possible inference" (*EBC I, Inc. v Goldman,
Sachs & Co.*, 5 NY3d 11, 19 [2005]).

Plaintiff is a partner at a large New York law firm and de-
fendant is the deputy senior university director of labor rela-
tions at a university in New York. The parties married in 1973,
separated in 2001, and were divorced during the summer of
2006. On June 27, 2006, they entered into an agreement to
divide their property (hereinafter referred to as the agreement).
Due to the length of their marriage, they agreed to an ap-
proximately equal division of marital property. They also agreed

that property would be valued as of September 1, 2004 (hereinafter referred to as the cut-off date).

Plaintiff received the parties' Scarsdale house and three of their automobiles; defendant received their Manhattan apartment (encumbered by a $370,000 mortgage) and an Audi. The parties agreed that each would keep accounts titled in his or her name. Plaintiff paid defendant $6,250,000 and transferred a further $368,000 to equalize the parties' retirement accounts.

Each party acknowledged "that the property he or she is receiving or retaining pursuant to this Article represents a fair and reasonable share of the marital property." The agreement contains mutual releases as well as a merger clause.

In the amended complaint, plaintiff alleges that at the time of their agreement the parties believed that they owned an account (hereinafter referred to as the Madoff Account) with Bernard L. Madoff Investment Securities which was their largest asset (purportedly $5.4 million as of the cut-off date). Of $6,618,000 that plaintiff paid defendant pursuant to the 2006 agreement, $2.7 million was attributable to defendant's share of what the parties believed to be their $5.4 million Madoff Account. This account was titled in plaintiff's name. Plaintiff alleges that in reality, there was no such account because Madoff was running a Ponzi scheme.

In the parties' agreement, plaintiff released, inter alia, "any and all claims to or upon the property of [defendant] . . . whether now owned or hereafter acquired or received, to the end that she shall have free and unrestricted right to dispose of her property now owned or hereafter acquired or received, free from any claim or demand of [plaintiff]." The releases in the parties' agreement did not bar plaintiff's claims as a matter of law (see e.g. Littman v Magee, 54 AD3d 14, 15 [2008]).

Plaintiff pleads mutual mistake with the requisite particularity (see CPLR 3016 [b]; Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 491 [2008]), and the amended complaint states a cause of action for reformation based on mutual mistake (see e.g. Banker v Banker, 56 AD3d 1105 [2008]; House v Wechsler, 104 App Div 124 [1905]). Contrary to defendant's contention, mutual mistake can be based on a statement by a third party (see e.g. D'Antoni v Goff, 52 AD2d 973 [1976]; House, 104 App Div at 127). The cases cited by defendant where claims were dismissed pursuant to CPLR 3211 (a) (5) did not involve mutual mistake.

The documentary evidence proffered by defendant (see CPLR 3211 [a] [1]) does not utterly refute plaintiff's factual allegations or conclusively establish a defense as a matter of law (see

*e.g. McCully v Jersey Partners, Inc.*, 60 AD3d 562 [2009]). With respect to the branch of defendant's motion based upon CPLR 3211 (a) (7), even though defendant submitted documents, "dismissal should not eventuate" unless she shows that a material fact alleged by plaintiff "is not a fact at all and unless it can be said that no significant dispute exists regarding it" (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]). Such is not the case here.

The motion court and the dissent both err in relying on the claim—which was not in defendant's affidavit—that, for several years after the parties' agreement, plaintiff could have redeemed what the parties believed to be their account for cash in excess of its supposed value as of the cut-off date selected by the parties (*see e.g. Rovello v Orofino Realty Co.*, 40 NY2d 633, 636 [1976]). Both the motion court and the dissent also err by resolving a fact—the assumption on which the parties relied in dividing their property—in defendant's favor on a motion to dismiss (*see Viskovich v Walsh-Fuller-Slattery*, 16 AD2d 67 [1962], *affd* 13 NY2d 1100 [1963] [trial was held when the plaintiff alleged that state of facts assumed to exist at time of the parties' agreement did not, in fact, exist]).

Indeed, the dissent speculates as to plaintiff's expectations that the "Madoff account . . . continue its highly profitable performance" and asserts "[a]ccordingly, he alone took on the risk that he might not be able to recoup his investment" citing *Reiss v Financial Performance Corp.* (97 NY2d 195, 201 [2001]).

A couple of observations are in order. First, in the context of a CPLR 3211 motion, plaintiff's motivations as alleged by defendant are irrelevant because the allegations in the amended complaint must be accepted as true. Second, *Reiss* is a declaratory injunction action concerning a stock swap; no allegation of mutual mistake is present.

Further, even though there is an express contract between the parties, it is unclear whether it covers the current dispute; therefore, plaintiff may plead unjust enrichment (*see e.g. IIG Capital LLC v Archipelago, L.L.C.*, 36 AD3d 401, 405 [2007]), and the amended complaint states such a cause of action (*see Simonds v Simonds*, 45 NY2d 233, 242 [1978]).

Finally, defendant and the dissent ignore the allegations of mutual mistake as to the actual existence of the account itself. Both defendant and the dissent attempt to foreclose plaintiff's claims by transmogrifying the claim of mutual mistake into a claim of mistake in valuation.

The dissent states: "[a]t the time of the agreement, Steven had an account in his name with [Madoff]." Untrue. Steven

*never* had an account in his name with Madoff; on Madoff's own admission there were no accounts within which trades were made on behalf of investors.

The dissent then states, "Steven liquidated part of the account to fund his payments to Laura." Untrue. In Madoff's Ponzi scheme what appeared to Steven and Laura to be a partial liquidation of an account was simply a payment to Steven that came from funds deposited by a more recent "investor" in what the "investor" believed was his own account.

The dissent further observes, "[Steven] did not liquidate the rest of the Madoff account . . . and he continued to invest in it." Untrue. There was no account which could be liquidated, as became apparent when Madoff received $7 billion worth of "liquidation" calls from investors in 2008. Nor was Steven "investing" in an account; his further contributions went directly to pay other "investors" in the scheme. Concur—Tom, Andrias and Catterson, JJ.

Gonzalez, P.J., and Moskowitz, J., dissent in a memorandum by Moskowitz, J., as follows: Today the majority unravels a carefully negotiated divorce settlement in which the husband received the benefit of his bargain. Instead of enforcing the plain language of the agreement between the parties, the majority relies on the doctrine of "mutual mistake" to rewrite it. However, even if one accepts that mutual mistake is the appropriate analysis, the complaint fails. It fails first because the alleged mutual mistake does not involve a fundamental assumption of the contract. It further fails because the alleged mistake did not exist at the time the parties entered into their agreement. Moreover, the majority's approach undermines decades of established precedent favoring finality in divorce cases. Thus, the conclusion the majority reaches, not only fails to follow precedent, but is truly "divorced" from reality.

## The Separation Agreement

Plaintiff Steven Simkin and defendant Laura Blank[1] married in 1973 and have two children, born in 1981 and 1984. The parties separated in 2001. On June 27, 2006, they entered into an agreement to divide their property (the agreement). The agreement involved a complex series of transactions—a fact the complaint fails to take into account. The division of property was quite specific. Steven, the monied spouse, was to pay Laura an aggregate sum of $6,250,000: "As and for an equitable distri-

---

1. This dissent adopts the same delineations as are in the complaint and therefore refers to plaintiff as "Steven" and defendant as "Laura."

bution of property, excluding pension and retirement funds . . . and in satisfaction of the Wife's support and marital property rights, the Husband shall pay to the Wife an aggregate and all inclusive amount of $6,250,000." In exchange, Laura waived all spousal support, and, upon payment, was to convey "all her right, title and interest" to the parties' residence in Scarsdale, New York to Steven. Laura also received the parties' Manhattan apartment and the $370,000 mortgage that encumbered it. In addition, Steven rolled over to Laura's retirement account an additional $368,000 "[t]o equalize the difference in value between the Husband's Retirement Accounts and the Wife's Retirement Accounts" as "the parties have agreed to divide the value of such accounts equally." This part of the agreement addressing the division of retirement accounts is the only place that mentions equal division or equalization of specific property. The parties also acknowledged in the agreement that they were waiving rights to equitable distribution of their property.

In addition, in the paragraph covering "Intangible Personal Property," Steven recognized that he retained "all right, title and interest in and to all bank, brokerage and similar financial accounts in his name, including his capital account as a partner at Paul Weiss." Similarly, the preceding paragraph states that "[w]ife shall retain all right, title and interest in and to all bank, brokerage and similar financial accounts in her name." The article of the agreement addressing "debts" states that "[h]usband covenants and agrees to pay all debts, charges and liabilities incurred by him before or after the execution of this agreement for which Wife may be or may become liable and to keep Wife free and harmless and indemnified of and from all and any such debts, charges or liabilities heretofore and hereafter contracted by him." Laura made a reciprocal covenant.

The parties also entered into mutual releases whereby they agreed to release "any and all claims to or upon the property of [the other]" whether real or personal and agreed to release and discharge the other from: "All debts, sums of money, accounts, contracts, claims, causes or causes of action, suits, dues, reckonings, bonds, bills, specialities, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, in law or in equity, which each of them had, now has or hereafter can, shall or may have by reason of any matter from the beginning of the world to the execution of this agreement." The parties acknowledged that they entered the agreement freely and had obtained independent legal advice. The agreement also contains a merger clause: "No oral statement or prior written matter, extrinsic of this

agreement, shall have any force or effect. The parties are not relying on any representation other than those expressly set forth herein." It also states that "[t]his agreement is entire and complete and . . . no representations, agreements, promises, undertakings or warranties of any kind or nature have been made by either party."

At the time of the agreement, Steven had an account in his name with Bernard L. Madoff Investment Securities (the Madoff account), that was supposed to consist of securities and other assets. The agreement does not mention the Madoff account, but Steven liquidated part of the account to fund his payments to Laura under the agreement. Pursuant to the agreement, Steven retained title to all his accounts, including this account. He did not liquidate the rest of the Madoff account after the parties divorced, and he continued to invest in it. As we all now know, Bernie Madoff was operating the world's largest Ponzi scheme. Today, the Madoff account is presumably worthless.

As mentioned earlier, in exchange for Laura giving up spousal support, all interest in the marital home in Scarsdale, New York and certain personal property, Steven paid Laura $6.25 million. Although the agreement says nothing of the kind, Steven now claims that $2.7 million of the $6.25 million he gave her was Laura's share of the Madoff account. He arrives at this figure by claiming that: (1) the parties were supposed to divide this particular marital asset equally; and (2) as of the valuation date of September 1, 2004, the parties valued the Madoff account at $5.4 million.

### The Complaint

Plaintiff seeks to reform the settlement agreement on the grounds of mutual mistake and seeks payment from Laura of an amount to be determined as restitution, indemnity or otherwise. Steven's far-flung request for relief relies on the theory that the Madoff account never really existed and therefore the parties were mistaken when they valued it at $5.4 million as of September 1, 2004. Because of this "mutual mistake," the parties' supposed intention to divide this asset equally did not come to fruition. Steven therefore seeks to reform the agreement. He also asserts a claim for unjust enrichment/restitution claiming Laura has been unjustly enriched based on the mutual mistake concerning the Madoff account and that she should pay him restitution that "would put the parties in the position they intended." Within his claim for unjust enrichment, Steven also contends that, should the trustee overseeing the liquidation of Madoff Securities seek clawback from Steven, Laura should

provide an indemnification and defense. Steven asserts this claim against Laura even though the trustee has not asserted a claim against him and may never do so.

To reform a contract on the ground of mutual mistake, the mutual mistake must involve a "fundamental assumption of the contract" (*True v True*, 63 AD3d 1145, 1147 [2009]). "[P]roof of mistake must be of the highest order and must show clearly and beyond doubt that there has been a mistake" (*id*. [internal quotation marks, citations and brackets omitted]). "When the writing expresses the actual agreement it cannot be reformed and a stipulation, not assented to, can never be added" (*Curtis v Albee*, 167 NY 360, 364 [1901]).

In this case, the alleged mutual mistake does not undermine any "fundamental assumption" in the contract. Nothing in the agreement states that the parties agreed to divide the Madoff account equally. Nothing in the agreement attributes $2.7 million to Laura's share of the Madoff account. Indeed, the agreement does not even mention the Madoff account, even though this account was supposedly the "couple's largest asset." With the exception of a payment to equalize their retirement accounts, the agreement does not state that the parties were to divide any particular asset equally. Nor does the agreement dictate how Steven was to pay Laura. Significantly, however, the agreement does mention that, for Steven's payment of $6.25 million, Laura was to forego spousal support, acquire property encumbered by a mortgage and forego her share of the parties' residence in Scarsdale as well as certain valuable personalty.

As the agreement does not address how Steven was to pay Laura, he was free to put together the fund by other means such as a home equity loan or borrowing against his retirement account. That he chose to liquidate in part the Madoff account, does not diminish one iota the amount that was due Laura under the agreement. To suggest otherwise contradicts the terms of the written agreement (*compare Lusk v Lusk*, 55 AD3d 408, 408 [2008] [although separation agreement did not address specific contingency of a tax refund from a postdivorce amended return, wife was entitled to half of refund pursuant to clear terms of the agreement stating that refunds "shall be divided equally"]; *True v True*, 63 AD3d at 1147-1148 [court found mutual mistake as to number of shares defendant was to receive where the stipulation between divorcing spouses specifically referred to the shares as being available for division between the parties]). The Court of Appeals has repeatedly warned that "an omission or mistake in a contract does not constitute an ambiguity . . . Even where a contingency has been omitted, we

will not necessarily imply a term since courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001] [internal quotation marks and citations omitted]). In total disregard for clear Court of Appeals precedent, the complaint, under the guise of a "mistake," seeks to rewrite the agreement between the parties. Steven received exactly what he bargained for, including sole title to a house in Scarsdale. To require Laura to give back any of the $6.25 million would result in a serious windfall to Steven, who received valuable consideration in exchange for this payment and, notably, does not suggest that he give back half the house or commence spousal support payments.

One would think that Steven would not have signed an agreement in which he waived equitable distribution if the parties had agreed to divide each particular asset equally. The parties were certainly capable of discussing equal division of specific property. They did so with respect to only one asset, the retirement accounts.

The majority ignores the plain language in the agreement. Instead, it leans on the doctrine of "mutual mistake" to rewrite the agreement between the parties. However, even under the majority's theory, the complaint cannot stand. Under the settled doctrine of mutual mistake, the alleged mistake must exist at the time the parties executed their agreement (*Matter of Gould v Board of Educ. of Sewanhaka Cent. High School Dist.*, 81 NY2d 446, 453 [1993]). The amended complaint repeatedly identifies the mistake to be that the parties thought they had an investment account worth $5.4 million, when it was actually nonexistent. However, this allegation clearly conflicts with the allegation in the amended complaint that Steven withdrew actual money from this "nonexistent" account at the same time in 2006 to pay Laura. Thus, even looking at the amended complaint in isolation (i.e., without the agreement), plaintiff has failed to plead a mutual mistake that existed at the time the parties entered into their contract.

The majority also relies heavily on the circumstance that this is a motion to dismiss. However, a motion to dismiss is not an opportunity to set aside the clear language of a properly executed agreement (*see Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398 [2009]; *see also Sweeney v Sweeney*, 71 AD3d 989, 991 [2010] ["(w)hen the moving party offers evidentiary material, the court is required to determine whether the proponent of the pleading has a cause of action, not whether

she has stated one" (internal quotation marks and citation omitted)]). The majority also makes the conclusory assertion that the documentary evidence "does not utterly refute plaintiff's factual allegations or conclusively establish a defense as a matter of law" but never explains why. Indeed, the majority barely addresses the agreement at all except to acknowledge that there is an express contract between the parties but claims, without explanation or addressing the arguments in this dissent, why it is "unclear whether it covers the current dispute."

The majority faults the citation to *Reiss v Financial Performance Corp.* (97 NY2d 195 [2001]), on the ground that this case did not involve a claim of mutual mistake. What the majority fails to comprehend is that plaintiff's theory of mutual mistake is irrelevant because the express terms of the agreement address the situation at hand. *Reiss* requires New York courts to enforce the express language of an agreement even where the results contradict expectations and disadvantage one party, while arguably resulting in a windfall to the other (97 NY2d at 199-201; *see also McCaughey v McCaughey*, 205 AD2d 330 [1994] [no reformation of agreement even though husband lost his job as an investment banker where husband received substantial benefits, including a house, and was aware of the possibility he might become unemployed a year after he made the agreement]).

Because Steven received significant value in exchange for the payment of $6.25 million to Laura, his retention of the Madoff account and subsequent losses render this case no different than the legion of cases denying a spouse's request to open up a divorce settlement where the final value of an asset was not what the parties believed at the time of the divorce (*see e.g. Greenwald v Greenwald*, 164 AD2d 706, 721 [1991], *lv denied* 78 NY2d 855 [1991] [post-trial depreciation of two investment accounts did not entitle husband to new trial because "post-trial changes in value may not be used to reallocate the distribution of marital assets to strike a more equitable balance"]). Certainly, had the Madoff account substantially increased in value, Laura would not be able to share those benefits (*see e.g., Etzion v Etzion*, 62 AD3d 646 [2009], *lv dismissed* 13 NY3d 824 [2009] [no mutual mistake where market value of warehouse property substantially increased in value after City announced rezoning plan subsequent to the divorce]; *Kojovic v Goldman*, 35 AD3d 65 [2006], *lv denied* 8 NY3d 804 [2007] [wife precluded from challenging validity of settlement agreement where husband sold his minority interest in company after divorce]; *Siegel v Siegel*, 132 AD2d 247 [1987], *appeal dismissed* 71 NY2d

1021 [1988], *lv denied* 74 NY2d 602 [1989] [plaintiff's motion for a new trial denied when artist Diego Giacommetti died after the trial and artwork, now defendant's sole property, substantially increased in value]). Steven negotiated successfully to retain the Madoff account, presumably because he expected the Madoff account to continue its highly profitable performance. After the valuation date of September 1, 2004, he invested more money in it. Accordingly, he alone took on the risk that he might not be able to recoup his investment (*see Reiss*, 97 NY2d at 201 [noting while "(w)e should not assume that one party intended to be placed at the mercy of the other . . . (, i)t does not follow, however, that Financial should be given a comparable remedy to save it from the consequences of its own agreements and its own decision"]). Laura cannot be responsible for Steven's independent decision to continue to hold his investment with Madoff. Just as she would not have benefitted from any increase in the value of the account, she should not have to bear the burden of its loss.

"In general, a final judgment of divorce issued by a court having both subject matter and personal jurisdiction has the effect of determining the rights of the parties with respect to every material issue that was actually litigated or might have been litigated" (*Rainbow v Swisher*, 72 NY2d 106, 110 [1988]). "[A]bsent unusual circumstances or explicit statutory authorization, the provisions of the judgment are final and binding on the parties, and may be modified only upon direct challenge" (*id.*). The reason courts routinely reject attempts to revalue assets is obvious. To recognize unforeseen changes in the value of property to modify the distribution "would effectively undermine the finality of judgments in matrimonial actions" (*Siegel v Siegel*, 132 AD2d at 254; *see also Kojovic*, 35 AD3d at 68 [barring wife's action "out of respect for the integrity and finality of divorce settlements"]; *Greenwald*, 164 AD2d at 722 [same]). As the Court of Appeals has noted, the "essential objective" in a matrimonial action "is to dissolve the marriage relationship" (*Boronow v Boronow*, 71 NY2d 284, 290 [1988]). To continue unnecessary litigation is "particularly perverse" in the divorce context because it continues the relationship and conflict between the parties (*id.* at 291). By accepting plaintiff's argument, the majority effectively grants leave to litigants in matrimonial actions to seek repeatedly to modify final judgments based on allegations that certain of the assets distributed may have depreciated in value or disappeared because of outside events since the time of the trial or settlement and judgment. The majority's decision will result in chaos, not only for the court system, but for the litigants as well, who deserve finality and to

move on (*see Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 383 [1993] ["a settlement produces finality and repose upon which people can order their affairs"]).

Finally, the motion court properly rejected Steven's claim for unjust enrichment. "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded" (*IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 NY3d 132, 142 [2009], citing *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 388 [1987]). Steven cannot assert an alternative claim for unjust enrichment because the terms of the agreement control.

To the extent the unjust enrichment claim seeks to compel Laura to indemnify and defend Steven from any attempts by the trustee overseeing the liquidation of Madoff Securities to seek clawback from Steven, this lawsuit is not yet ripe, and indeed may never be.[2] First, the trustee is not pursuing Steven at this time. Moreover, for the trustee ever to recover against Steven as an innocent investor in a Ponzi scheme, the trustee would likely have to show that Steven was: (1) a "net winner" and (2) that amounts Steven received in profit were within the limitations period (*see e.g. Donell v Kowell*, 533 F3d 762, 776 [9th Cir 2008], *cert denied* 555 US —, 129 S Ct 640 [2008]; *Citicorp Trust Bank, FSB v Makkas*, 67 AD3d 950, 952 [2009] [statute of limitations for constructive fraud under New York's Debtor and Creditor Law is six years from the date of the fraudulent transfer]). Thus, if and when Steven will be liable is a far-off contingency (*see Heine v Heine*, 176 AD2d 77, 91 [1992] [tax impact evidence too speculative to support a claim for credit for taxes]). Accordingly, the unjust enrichment claim should be dismissed as speculative. Whether Steven can state a claim for unjust enrichment against Laura, if and when the trustee does bring a claim against Steven, is a question for another day.

---

2. The majority does not address this point.