[882 NYS2d 67]

RONALD FIELDS, Appellant, v LUCILLE FIELDS, Respondent.

First Department, June 25, 2009

**APPEARANCES OF COUNSEL**

*Arnold Davis*, New York City, for appellant.

*Hoffman, Polland & Furman, PLLC*, New York City (*Jessica Lee Leonard* and *Elliot R. Polland* of counsel), for respondent.

**OPINION OF THE COURT**

ACOSTA, J.

In this action for divorce, plaintiff husband seeks to divest 69-year-old defendant wife of her equitable share of their marital residence, where they have lived continuously for over 31 years and raised their only child, on the basis that the townhouse is separate property that he owns and manages with his mother, and that defendant had no impact on its increase in value. We disagree with plaintiff's as well as the dissent's basic premise that the townhouse is separate property, and therefore affirm.

The parties were married on August 1, 1970, and approximately 2½ years later, on March 19, 1973, the couple's son was born. The wife continued to work outside the home until February 1973, and returned to work outside the home six months af-

ter the birth. In 1978, the couple decided to purchase a house and found a five-story townhouse with 10 apartments on the Upper West Side of Manhattan. The wife testified that maintaining a 10-apartment townhouse would be far too much work for her in conjunction with childcare for a five year old after working outside the home all day. She therefore was prepared to invest in the property with her husband provided certain preconditions were met, including provisions for a maid's room and a live-in maid. The husband, unwilling to assent to the wife's preconditions, purchased the building with the help of his mother. The purchase price was $130,000, with $30,000 down and the balance made up through two mortgages. The husband's mother arranged for her son to get the down payment from his grandparents; $15,000 represented a bequest that he would have gotten, and $15,000 that his mother agreed to repay to the grandparents. At the time of trial, the townhouse was appraised at $2,625,000.

The husband closed on the townhouse on August 31, 1978 and conveyed a one-half interest to his mother, as a joint owner, on September 6, 1978. Thereafter, from 1982 to 2001, the husband and his mother managed the townhouse as a formal partnership. The mortgages, as well as the maintenance and most renovations, were satisfied through rents and refinancing. Certain renovations were made and paid for by the husband's mother.

The couple and their five-year-old child moved into apartment 2 until apartment 1 was turned into a duplex with the basement apartment in 1979. The husband and his parents each paid rent to the partnership, of $1,100 per month, for their respective apartments, until 2002.

The couple lived in apartment 1 for five months, until the wife became ill. Believing that the physical conditions of the basement apartment were causing her illness, she moved into vacant apartment 3, for which she paid rent. In 1983, following a burglary in that apartment, she moved into apartment 2, but returned to apartment 1 to practice piano and take baths.

The wife purchased some furniture for apartment 1 and "occasionally" swept and vacuumed the hall in front of the apartment entrance. She testified that she would clean up the lobby during renovations. She also purchased a $600 vacuum cleaner to clean the lobby three times a week, cleaned the mailbox vestibule, swept the interior and exterior steps, used bleach to clean dog excrement from the sidewalk, and raked leaves from a

maple tree in the backyard. In the summers, when the husband would go to France to spend time with his mother, the wife took responsibility for disposing of the building's refuse. She washed lobby curtains, cleaned lobby windows and polished the lobby mirror. She also decorated apartment 1, planted and maintained the backyard, and bought patio furniture.

In addition to these services, the wife purchased a carpet, and a $500 Formica countertop for the marital apartment, as well as paying $700 for flooring in the foyer. She paid $400 for a foyer mirror, and paid for couches, a basement door installation, linen closet, bathroom cabinets and a chandelier.

In 1982, the husband and his mother opened a partnership account at Citibank into which rents and mortgage funds were deposited. He testified that he occasionally deposited his paychecks into this account as well as a $35,000 inheritance, which he used for personal expenses. Occasionally, the account would be used as a "pass through" for his wife's paychecks. She would deposit the check in the account and a transfer for that amount would be "wired" to her separate account. Other times, the husband would deposit the wife's check into the account and he would give her cash. In addition to using the account to "accommodate" other transactions, the husband deposited into this account monies he earned from tax preparing and a video business, as well as income from managing a building across the street, which he described as "very small."

The husband commenced this action for divorce in February 2005, and on March 8, 2006, the court referred the issues of equitable distribution and counsel fees to a Special Referee. The Special Referee found that the marital property titled in the husband's name totaled $1,234,183.81. This included one half of the $2,625,000 value of the townhouse, less the $309,396 mortgage, and less the $30,000 separate property contribution the husband made to the acquisition of the property, as well 50% of the value of the Citibank account. There were also three other bank accounts totaling a little over $20,000, titled in the husband's name. The marital property titled in the wife's name totaled $71,892.60.

Citing to *Maczek v Maczek* (248 AD2d 835, 837 [1998] ["A party is entitled to a return of the total contribution he (or she) made toward the purchase of the marital residence from his (or her) separate property" (internal quotation marks omitted)]), the Special Referee found that the $30,000 down payment to be the husband's separate property, and a baby grand piano and an oak table owned by the wife to be her separate property.

The Special Referee then found that the wife was entitled to 35% of the marital property.[1] With respect to the townhouse, he found that the wife "participated in and made countless contributions to the building, both directly and indirectly"[2] even though she "was not interested in the investment," and that the "building expenses were paid from rent proceeds." The Special Referee also found that the wife contributed to the building indirectly as spouse and mother.

The court confirmed the Special Referee's report in the judgment of divorce, entered June 22, 2007. A money judgment in the amount of $393,118.22 was entered on October 10, 2007 in favor of the wife. The husband appeals, in this consolidated appeal, from both the judgment of divorce and the money judgment. We now affirm.

█ The subject property, a valuable townhouse, was purchased by the husband in 1978 during his marriage to his wife and served as their marital residence. The parties raised their son in this residence and have lived in various configurations continuously ever since. That the husband used separate property for the down payment and that the property was titled in his and his mother's name does not change the fact that his half interest in the property is a marital asset. These circumstances merely entitle the husband to a credit for his contribution of separate property toward the purchase of the marital residence,

---

**1.** The parties had also previously stipulated to equalizing their respective pensions. The wife's pension was valued at $520,520.25 and the husband's was valued at $1,173,723.07. Thus, in order to equalize them, the wife received $326,601.50 from the husband's pension fund.

**2.** This included: cleaning the lobby three times a week; cleaning the mailbox vestibule; purchasing and using a $600 vacuum cleaner for the building; sweeping the interior and exterior steps of the building; cleaning dog excrement from the front of the property; sweeping the building's sidewalk; sweeping and bagging leaves each year from the maple tree in the backyard; bagging and taking out the building garbage when the husband went to France each summer; washing the lobby curtains; cleaning the lobby windows; polishing the lobby mirror; decorating the master bedroom with curtains and rugs; planting the gardens on the property; installing mirrors in the marital apartment; and washing walls in the building.

In addition to these services performed by the wife, she: purchased the rug for the son's room; purchased a bathroom cabinet; purchased bathroom wallpaper; purchased a Formica countertop for the marital apartment; purchased flooring for the building at a cost of $700; purchased the foyer mirror at a cost of $400; and paid for couches, a basement door installation, a linen closet, a bathroom cabinet and a chandelier.

The Special Referee noted that the husband acknowledged that his wife was involved in the day-to-day maintenance of the townhouse and that she swept and vacuumed the hall and front entrance.

which was accounted for by the Referee (*see Juhasz v Juhasz,* 59 AD3d 1023 [2009]; *Heine v Heine,* 176 AD2d 77, 84 [1992], *lv denied* 80 NY2d 753 [1992]).

Now, after living in the townhouse for over 31 years with his wife, where they raised their son, the husband is asking this Court to deem 100% of his half interest in the increase in the property's value (as well as the Citibank account)[3] as his separate property because his 69-year-old wife did not contribute to the down payment or to the management of the property. This position, however, is inconsistent with Domestic Relations Law § 236 (B) (1) (c), which defines marital property as "all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, *regardless of the form in which title is held*" (emphasis added). The term "marital property" is construed broadly in order to give effect to the "economic partnership" concept of the marriage relationship recognized in the statute (*see Majauskas v Majauskas,* 61 NY2d 481, 489-490 [1984]); "separate property," on the other hand, which is described in the statute as an exception to marital property, is construed narrowly (*see id.* at 489).

The facts of this case are similar to those in *Heine* (176 AD2d 77 [1992], *supra*), where the parties purchased a townhouse with several apartments shortly after they were married. The husband used separate property for the down payment and the parties secured two mortgages. The parties lived in a duplex and then a triplex apartment, but always rented at least one of the apartments. In distributing the marital assets, this Court credited the husband with the amount of the down payment, noting that "[w]here a spouse contributes separate property towards the creation of a marital asset, he or she is entitled to a credit for the amount of property contributed" (*id.* at 84). Significantly, however, this Court held that the appreciation in value of the townhouse was marital property inasmuch as it was not attributable to the down payment, but rather to renovations paid for with marital funds, mortgage payments made with marital funds and market forces (*id.*). Here, although the wife was not involved in the renovations of the property to the

---

**3.** ■ The Citibank account was marital property because the husband commingled numerous marital funds in this account and failed to trace them sufficiently to delineate what might have been separate property (*see McManus v McManus,* 298 AD2d 189 [2002]; *Sarafian v Sarafian,* 140 AD2d 801, 804 [1988]).

extent that the wife was in *Heine*, it is clear that the property's appreciation in value, as in *Heine*, had nothing to do with the husband's down payment. In fact, the appraiser testified that market forces accounted for the greatest increase in value. Moreover, as noted above, the parties treated the property as their marital residence. They lived in it since 1978, raised their child there, and the wife, as the Special Referee found, maintained the property by vacuuming, raking leaves, cleaning up after workers, as well as by doing many other chores typical of a person living in a marital residence. To deprive the wife of her equitable share of the value of this property is not only contrary to settled precedent, but also against public policy. The husband's half interest in the townhouse is therefore marital property subject to distribution.

■ Furthermore, " '[e]quitable distribution presents matters of fact to be resolved by the trial court, and its distribution of the parties' marital property should not be disturbed unless it can be shown that the court improvidently exercised its discretion in so doing' " (*McKnight v McKnight*, 18 AD3d 288, 289 [2005], quoting *Oster v Goldberg*, 226 AD2d 515 [1996], *lv denied* 88 NY2d 811 [1996]). Here, the Special Referee and the trial court correctly considered the various factors listed in Domestic Relations Law § 236 (B) (5) (d) and determined that the wife was entitled to 35% of the marital assets. These factors included, inter alia, that "both parties had made economic and non-economic contributions to [the] 35-year-old marriage, their son and townhouse," as well as "the length of the marriage, and the wife's direct and indirect contributions as a spouse and mother." On these facts, it cannot be said that the trial court improvidently exercised its discretion.[4]

The dissent seeks to divest the wife of her equitable share of the townhouse by reclassifying it as separate property. As such, the dissent argues that the husband is not only entitled to the down payment, but also to one half of the appreciation of the townhouse pursuant to Domestic Relations Law § 236 (B) (1) (d) (3), which states that separate property includes "the increase in value of separate property, except to the extent that

---

4. The wife challenges this distribution, claiming 50%. However, this issue is not properly before us because she never filed a cross appeal. Were we to consider the issue, we would nonetheless affirm. "Equitable distribution does not necessarily mean equal distribution" (*McKnight*, 18 AD3d at 289). Here, the husband made the greater contribution to the marital assets, financial and otherwise.

such appreciation is due in part to the contributions or efforts of the other spouse." The dissent then posits that since the wife cannot show that her contributions to the property had any effect on its appreciation, such appreciation is not marital property subject to distribution.

The flaw in the dissent's analysis is that it incorrectly classifies the townhouse as a "separate" business rather than a marital residence because the husband and his mother formed a partnership, rented some of the apartments, used rent receipts to pay the mortgage and taxes, and refinanced to do major renovations. But title in property is not what defines marital property (Domestic Relations Law § 236 [B] [1] [c]), and the formal partnership between plaintiff and his mother was not formed until four years after the property was purchased. The fact that the marital residence can also be used to generate income, such as in *Heine*, does not therefore reclassify marital property into separate property. Thus, *Hartog v Hartog* (85 NY2d 36 [1995]), *Xikis v Xikis* (43 AD3d 1040, 1041 [2007], *lv denied* 10 NY3d 704 [2008]) and *Pauk v Pauk* (232 AD2d 386, 391-392 [1996], *lv dismissed* 89 NY2d 982 [1997]), relied on by the dissent for purposes of determining a nontitled spouse's right to the appreciation in value of separate property, are inapposite. *Hartog* is instructive, however, in that it shows the Court's reluctance to deprive a spouse of her equitable share of marital assets (*see Hartog*, 85 NY2d at 45-47 [to force the non-titled spouse to show with "mathematical, causative or analytical precision" that her efforts contributed to the increase in value of separate property would be "contrary to the letter and spirit of the relevant statutes," "inconsistent with legislative intent," and "at odds with the purport of this Court's precedents construing the Legislature's directives"]).

Moreover, it is not for this Court to dictate what a "normal" marriage should be. That the wife spent most of her time in one apartment, but showered and practiced the piano in the apartment used by the husband, is of no moment. Married couples are free to live by whatever arrangement suits them best. Clearly, if the wife were an artist and used one of the units as her studio and spent most of her time there, no one would blink an eye. That the wife chose not to invest any of her funds in the down payment because her preconditions were not met by the husband is also irrelevant. Had she wanted the house without any preconditions but simply did not have funds to contribute toward the down payment, the townhouse would still have been the marital residence for the reasons stated above.

Accordingly, the judgment of the Supreme Court, New York County (Jacqueline W. Silbermann, J.), entered June 22, 2007, awarding defendant a divorce with legal fees and distributing the marital assets, and judgment, same court (Laura Visitacion-Lewis, J.), entered October 10, 2007, awarding defendant a money judgment in the principal sum of $385,234.14, should be affirmed, without costs.

McGUIRE, J. (dissenting). In this divorce action, the record establishes that defendant wife fell woefully short of meeting her burden of showing that she contributed to the appreciation of a building purchased by plaintiff husband and his mother as a business venture. Accordingly, I respectfully dissent.

The parties were married in 1970 but have lived apart for approximately the past 30 years, though sharing occasional meals until 1997. There is one child of the marriage who was born in March 1973. The record indicates that the parties contributed equally to the child's upbringing. The record also indicates that the parties had a tacit agreement that the wife was free to keep her own money and to do whatever she wanted with it, except that both were to share equally in the costs of the child's education and transportation expenses. The parties initially had one joint checking account (the Amalgamated Account) that they opened when they first married and that the record shows was kept solely for the convenience of depositing joint tax refund checks.

After residing in rental apartments during the first few years of their marriage, the husband, in August 1978, purchased a five-story building located on West 107th Street. Because the wife wanted a maid and living quarters for the maid, as well as a litany of other criteria to which the husband would not agree, the wife did not participate in the purchase.

The purchase price of the building was $130,000, with a $30,000 down payment. The husband testified that at the time of the purchase he did not have the requisite funds. He was able to produce the $30,000 down payment from money received from his grandparents: $15,000 represented a bequest that he would have received and the other $15,000 the husband's mother was going to repay to the grandparents.

Shortly after purchasing the building, the husband conveyed a one-half interest to his mother, as a joint owner. Thereafter, from 1982 to 2001, the husband and his mother operated the building as a formal partnership. In 1982, a partnership account was opened at Citibank (the Citibank Account), into which

rents and mortgage funds were deposited. The husband testified that he managed the building together with his mother.

Shortly after the husband purchased the building, he and the wife moved into one of the 10 apartments located in the building and paid rent to the building partnership each month. For the first few months, the couple lived together in apartment 1 but after the wife got sinusitis, she moved into apartment 3, for which she paid rent. Then, after a burglary occurred in apartment 3, the wife moved into apartment 2, and used apartment 1, where husband was still living, to practice piano and take baths.

At the hearing before the Special Referee, the wife testified as follows as to her contributions to the business venture: initially, she purchased some furniture for the marital apartment; she "occasionally" swept and vacuumed the hall in front of the apartment entrance; she would clean up the lobby after workers finished certain renovations; she purchased a $600 vacuum cleaner to clean the lobby three times a week; she cleaned the mailbox vestibule; she swept the interior and exterior steps and used bleach to clean dog excrement from the sidewalk; and she raked leaves from a maple tree in the backyard starting in 1996. Furthermore, she testified that during one summer, when the husband went to France to visit his mother, she bagged the garbage and put it out because she did not like how the hired man was doing it. She also stated that she washed lobby curtains and cleaned lobby windows as well as polished the lobby mirror; finally, she decorated the marital apartment.

In addition to these services, the wife testified that she purchased a $45 carpet and a $500 Formica countertop for the marital apartment, as well as paying $700 for flooring in the foyer. She also testified that she paid $400 for a foyer mirror, and paid for couches, a basement door installation, a linen closet, bathroom cabinets and a chandelier. Not surprisingly, she offered no testimony from any appraiser or other expert that these routine and minor maintenance efforts and equally minor expenditures for ordinary costs of living somehow enhanced the value of the building itself. Indeed, it defies common sense to think that, for example, raking leaves and occasionally cleaning dog excrement contributed a farthing to the appreciation of the building. Surely a buyer would pay the same price if these maintenance efforts did not take place until the day before the building was shown to the buyer.

Undisputed evidence established as well that the husband collected rents and was in charge of the management of the build-

ing. The husband and his parents paid rent to the partnership (the parents began paying rent when they moved into the building in the spring of 1989).

The expert witness appraiser testified that the building was valued at $2,350,000 and that it would be attractive as either a rental property or as an owner-user property. He testified that the most attractive apartments, 3, 4 and 5, contributed to the appreciation, but the wife played no role in the appreciation attributable to these apartments. It was undisputed, after all, that these apartments were renovated and paid for by the husband's mother. Even more critical here is that the appraiser testified without contradiction that the greatest increase in value was from "market forces." He explained that in 2004 and 2005, passive market forces alone increased the building's value by 2% per month, and by 1% per month since that time, up to the time of trial in July 2006.

Following the hearing, the Special Referee found that the wife "was not interested in the investment without an agreement to numerous preconditions . . . and that since husband could not meet wife's pre-conditions, he invested in the building with his mother." He also found that "[a]t all times building expenses were paid from rent proceeds." He further found:

> "[Wife] did not decorate the common areas, or apartments when they became vacant. She performed the following activities: sweeping or vacuuming the front hallway and stairs by her current apartment, polishing the mirror and windows in the entry hall by the mailboxes, and cleaning the front steps with pure bleach and water. At some point [in] time during one unspecified summer[ ], she became unhappy with the worker [husband] had engaged for maintenance while he was away in France, so she pitched in with bagging the garbage herself. Since her retirement, [wife] has also raked leaves each fall from the maple tree in the back yard. At no time did she engage in rent collection."

He further found:

> "At no time did [wife] contribute funds for the townhouse from the time of purchase until the present day. At all times parties agree that [husband] carried all the maintenance expenses for the matrimonial apartment, the utilities, and phone bills, and other maintenance costs."

Understandably, the Special Referee did not rely on the wife's marginal contributions to the maintenance of the building. Rather, the Special Referee determined that the wife contributed to the building through her role as spouse and mother. He concluded that while the property began as separate property, the wife's direct and indirect contributions rendered the husband's half interest in the building marital property and that the wife was entitled to 35% of that marital property.[1]

The court confirmed the Special Referee's report in the judgment of divorce, entered June 22, 2007. A money judgment was entered on October 10, 2007 in favor of the wife in the amount of $393,118.22. The husband appeals, in this consolidated appeal, from both the judgment of divorce and the money judgment.

Domestic Relations Law § 236 (B) creates two distinct categories of property: marital property that is subject to equitable distribution, and separate property, which is not (*see Price v Price*, 69 NY2d 8, 11 [1986]). The statute defines the term "marital property" to include "all property acquired by either or both spouses during the marriage" (Domestic Relations Law § 236 [B] [1] [c]), and the Court of Appeals has held that the term marital property must be construed broadly so as to give effect to the concept that marriage is an "economic partnership" (*Price*, 69 NY2d at 15). Separate property, which must be more narrowly construed, includes property "acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse" (Domestic Relations Law § 236 [B] [1] [d] [1]). Separate property also includes "property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse" (Domestic Relations Law § 236 [B] [1] [d] [3]). Property acquired during marriage is presumed to be marital property, and the party seeking to establish that particular property is separate property bears the burden of proof (*see* Domestic Relations Law § 236 [B] [1] [c]; *DeJesus v DeJesus*, 90 NY2d 643, 652 [1997]).

Initially, the husband met his burden of proving that the subject building was purchased as his separate property. He

---

**1.** The Special Referee determined that husband's one-half interest in the building, minus a $309,396 mortgage and minus $30,000 of husband's separate property used to purchase the property, was marital property. He valued the property at $2.625 million, making the husband's interest, minus these deductions, equal to $1,127,802.

purchased it in his own name with funds received by him as a gift (*see Spector v Spector*, 136 AD2d 939 [1988]). It is undisputed that the only money that the husband invested in the building was his initial $30,000, all of which was given by his grandparents. It is also undisputed that the wife did not contribute financially to the initial purchase and that none of the wife's funds were ever used to pay for building expenses. Indeed, the Special Referee found that "[a]t all times the building expenses were paid from the rent proceeds, taxes. Taxes were billed in the names of [husband's mother] and [husband] and paid from the building account." It is undisputed, moreover, that improvements to the building, including a new boiler and roof, were financed both by capital contributions from the husband's mother, his partner, and by proceeds derived from mortgage refinancings.

The wife's claim that the husband failed to trace the origins of the down payment, by failing to produce the cancelled checks given to him, is without merit. The husband testified that the money came from his grandparents, and the wife did not challenge this assertion in any way. She did not testify that husband possessed, or could have possessed, sufficient marital funds to pay the $30,000 down payment. Nor did she testify that the fact of the $30,000 gift was unknown to her. Indeed, she did not present any alternative account of how her husband acquired the $30,000. Her sole objection rests on the untenable claim that because the husband cannot produce the cancelled checks that would have been returned to his grandparents, he failed to meet his burden. The husband's inability to produce checks returned to the grandparents some 28 years ago certainly does not preclude a finding that the $30,000 was a gift (*see Chiotti v Chiotti*, 12 AD3d 995 [2004] [defendant's inability to produce a complete paper trail from gift or inheritance to trial does not require a finding that the property was not a gift or a bequest, particularly as there was no evidence suggesting other possible sources of the accounts]).

Equally without merit is the wife's claim that the $30,000 the husband received as a gift somehow transmuted into marital property. While the wife asserts that the checks produced by the husband at the closing came from "the parties' joint Citibank account," there is uncontroverted evidence in the record that the only "joint" bank account that the parties shared was the Amalgamated Account.

Turning to the main point of contention, since the husband established that the building was his separate property, it was

incumbent upon the wife to show that she contributed to the active or passive appreciation in the building's value. In *Pauk v Pauk* (232 AD2d 386, 391-392 [1996], *lv dismissed* 89 NY2d 982 [1997]), the Court held:

> "In order to obtain equitable distribution of the appreciation in value of the wife's separate property, the husband was required to demonstrate the manner in which his contributions resulted in the increase in value and the amount of the increase that was attributable to his efforts. The husband failed to sustain this burden, and the testimony at trial established that the appreciation was caused by an upturn in the real estate market" (citations omitted; *see also Hartog v Hartog*, 85 NY2d 36 [1995] and *Xikis v Xikis*, 43 AD3d 1040 [2007], *lv denied* 10 NY3d 704 [2008]).

Under this controlling standard, the wife utterly failed to establish that the appreciation in value of the husband's half-interest in the building was caused by either her direct contributions to the building or through her efforts as spouse and mother. The record is clear that the wife refused to participate in the purchase of the building. The record also makes plain that the wife's claimed efforts made on the building's behalf were actually performed for her own benefit and on a sporadic basis. At best, the sum total of the wife's contributions to the building constituted basic maintenance that did nothing to increase the value of the building or to undermine the expert appraiser's unequivocal and uncontradicted testimony.

Of course, Domestic Relations Law § 236 (B) (5) (d) (6) explicitly recognizes that indirect contributions of the nontitled spouse (e.g. services as spouse, parent and homemaker, and contributions to the other spouse's career or career potential) are as relevant to equitable distribution calculations as direct contributions. However, nothing in the record supports the conclusion that the wife made any indirect contribution to the building's appreciation in value by conduct that enabled the husband to spend more time in the development of the property. In fact, the record is clear that, as the Special Referee found, "[f]or the past 28 years the parties have lived apart, although they shared occasional meals until 1997." The Special Referee noted that in 1988 through 2001, rent was paid by the husband for the marital apartment without any contribution by the wife; during this period the parties were already occupying different

spaces in the building and they had roughly equal salaries and equal parental obligations (the wife kept her earnings and left it to the husband to pay utilities and other household expenses).[2]

Furthermore, nothing remotely indicates that the wife devoted more time than the husband to raising their son or that the husband was able to devote more time to the building because of the wife's conduct. The evidence bearing on these subjects, in brief, is as follows. At the time of the marriage in August 1970 the husband was a teacher for the New York City Board of Education, and the wife was a full-time student pursuing a master's degree in education with a part-time job at TWA (which she maintained for 12 years). In the winter of 1971, she obtained a job as a teacher with the Board of Education. During her pregnancy, the wife worked at both her jobs until February 1973. She returned to work in September 1973, almost six months after the couple's son was born. As the wife testified, she and the husband both contributed to the care of their son during that six-month period. She stopped teaching in 1977 and took a one-year nursing course and then worked as a licenced practical nurse. She returned to teaching, however, in the fall of 1978, but worked two nights a week that fall at a nursing home, and continued to teach until her retirement. Until 1973, the parties lived on the husband's paycheck. After the wife returned to work in September 1973, the husband took a one-term paternity leave to take care of their son. He also taught at night school and drove a cab during vacation. As the wife testified, the husband took care of their son when she worked nights.

It bears emphasizing once again that the only evidence of the property's appreciation was supplied by the expert witness appraiser, who testified that the increase in the building's value was almost entirely attributable to "market forces" (*see Price*, 69 NY2d at 18 ["where the appreciation is not due, in any part, to the efforts of the titled spouse but to the efforts of others or to unrelated factors including inflation or other market forces . . . the appreciation remains separate property, and the non-titled spouse has no claim to a share of the appreciation"]). The other, much less significant, reason for the appreciation of this separate property of the husband does not provide a shred of support for the wife's position. As the appraiser testified, certain

2. At the outset of the trial, the parties stipulated to equalize their pensions and tax deferred annuities with the New York City Board of Education. As a result, the husband transferred $326,601 from his total fund to the wife's total fund of $520,520.

renovations paid for by the husband's mother played a role in the appreciation, and the physical layout of the building made it attractive as either a rental property or as an owner-user property. The wife obviously did not contribute in the slightest to either component of the appreciation. In short, the wife's claim that the appreciation was due to her direct and indirect efforts is a pure makeweight. It is at odds with the appraiser's uncontradicted testimony and with all the other evidence adduced at the hearing.

The majority assumes that because the building was purchased during the parties' marriage the husband's interest in the building is entirely marital property. Thus, although it acknowledges "[t]hat the husband used separate property for the down payment and that the property was titled in his and his mother's name," the majority baldly asserts that plaintiff's "half interest in the property is a marital asset." In doing so, the majority ignores basic statutory precepts regarding equitable distribution, namely that separate property includes both property "acquired before marriage or property acquired by bequest, devise, or descent, or gift from a party other than the spouse" (Domestic Relations Law § 236 [B] [1] [d] [1]) and "the increase in value of separate property, *except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse*" (Domestic Relations Law § 236 [B] [1] [d] [3] [emphasis added]). Thus, to obtain an interest in the building, the burden rested on the wife to demonstrate the extent to which the building's appreciation was due to her contributions or efforts. As discussed above, she failed to do so. The majority is correct in suggesting that the wife was not required to establish with mathematical, causative or analytical precision the nexus between her contributions to improve the building and the appreciation in value of the building (*see Hartog*, 85 NY2d at 47). *However, that a causative contribution need not be established with precision does not mean that it need not be established at all.*[3]

---

**3.** Even if there were some factual basis for finding that indirect efforts of the wife played some causative role in the appreciation of the building (and there is not), only that *part* of the appreciation would be marital property. As the Court of Appeals stressed in *Hartog*, "*to the extent* that the appreciated value of separate property is at all aided or facilitated by the nontitled spouse's direct or indirect efforts, *that part of the appreciation is marital property subject to equitable distribution*" (85 NY2d at 46 [emphasis added; other emphasis deleted; internal quotation marks omitted]).

The majority's reliance on *Heine v Heine* (176 AD2d 77 [1992], *lv denied* 80 NY2d 753 [1992]) is woefully misplaced. In *Heine*, the husband supplied the down payment for the purchase of a five-story townhouse with separate property. But, unlike the wife in this case, the wife in *Heine* made substantial contributions to the building's appreciation—she supervised all of the extensive renovations thereto, and marital funds were used to pay for those renovations as well as the building's mortgage. In this case, by contrast, the wife did not supervise any (or play any role in) renovations to the building and marital funds were not used to pay for renovations to the building or the mortgages on the building.

At bottom, the majority's conclusion that all of the appreciation of the husband's interest in the building is marital property is not grounded in either the facts or the law. Instead, the majority repeatedly stresses that the building "served as the[ parties'] marital residence" and that the parties "raised their son in [the building]." In addition, the majority characterizes the building as "valuable" and makes repeated references to the length of the parties' marriage and the wife's age. Of course, none of this has any relevance to the critical legal issue here— whether the wife demonstrated the extent that the building's appreciation was due in part to her contributions or efforts.

Finally, I concur with the majority that the record demonstrates that the Citibank Account is marital property. Although the account was opened to maintain rents and mortgage funds obtained by the partnership, those funds were commingled with marital property, i.e., deposits of money earned by the husband from his management of a separate building, proceeds from the husband's other business interests and wages earned by the husband. The husband acknowledged that he could not attribute any portion of the funds in the Citibank Account to any particular source of money because the funds in the account were "a mishmash." Thus, he failed to trace adequately the source of the funds in that account and consequently failed to rebut the presumption that all of the funds in the account are marital property (*see McManus v McManus*, 298 AD2d 189 [2002]; *Pullman v Pullman*, 176 AD2d 113 [1991]).

MAZZARELLI, J.P., and RENWICK, J., concur with ACOSTA, J.; CATTERSON and McGUIRE, JJ., dissent in a separate opinion by McGUIRE, J.

Judgment, Supreme Court, New York County, entered June 22, 2007, and judgment, same court, entered October 10, 2007, affirmed, without costs.