■ WENDY S. POPOWICH, Respondent, v JASON KORMAN, Appellant. [900 NYS2d 297]—

Judgment, Supreme Court, New York County (Joan B. Lobis, J.), entered December 18, 2006, insofar as appealed from as limited by defendant-appellant's brief, awarding plaintiff a money judgment of $1,844,931 plus statutory interest on her cause of action for repayment of certain loans and a distributive award of $886,907, and awarding defendant no share of the value of plaintiff's brokerage account and $30,000 representing a five-months' share of the appreciation of the value of the New York townhouse, modified, on the law and the facts, to vacate the money judgment and dismiss the cause of action for repayment of the loans, to reduce the distributive award of $886,907 to $560,747, to award defendant $253,751 representing 15% of the value of the brokerage account, and to increase defendant's share of the appreciation on the townhouse to $54,000, and otherwise affirmed without costs. The Clerk is directed to enter an amended judgment accordingly.

Certain loans made by plaintiff are central to this appeal. Plaintiff contends that the loans were made to defendant, but defendant contends that the loans were made to California Direct Limited (CDL), a corporation he formed and partially owns. As discussed below, because it would avail plaintiff nothing if we were to regard the loans as loans to defendant, we will assume without deciding that the loans were made to CDL.

Supreme Court erred in determining that plaintiff's separate property included the right to repayment of the loans, as she "failed to demonstrate that the loans were not made with marital funds" (*Sagarin v Sagarin*, 251 AD2d 396, 396 [2d Dept 1998]). To the contrary, as Supreme Court found in its decision, plaintiff's separate property was commingled with marital property in the brokerage account of plaintiff from which the loans were made. Of course, plaintiff's separate property was the source of the loans made prior to the marriage, but it is undisputed that the premarital loans were repaid in full. Accordingly, as Supreme Court should have concluded that the brokerage account in plaintiff's name was marital property (*see Pullman v Pullman*, 176 AD2d 113 [1st Dept 1991]; *Kirshenbaum v Kirshenbaum*, 203 AD2d 534, 535 [2d Dept 1994]), it also should have concluded that the right to repayment of the loans was marital property. Notably, because marital property and plaintiff's separate property were commingled in the brokerage account, Supreme Court correctly concluded that two properties, a beach house and a townhouse purchased in whole or in part with funds from the brokerage account, were marital property subject to equitable distribution. For the reasons discussed

below, although the right to repayment of the loans is marital property, a remand for the purpose of conducting further proceedings to value this asset is not warranted.

Supreme Court also erred in concluding that defendant was liable to plaintiff for repayment of the loans. Because the written guaranty requires defendant to repay the loans, it is an agreement that makes "provision for the ownership, division or distribution of separate and marital property" (Domestic Relations Law § 236 [B] [3]). The guaranty was executed by defendant during the marriage, but was not "acknowledged or proven in the manner required to entitle a deed to be recorded" (*id.*). Accordingly, the clear terms of the statute render it unenforceable (*Matisoff v Dobi*, 90 NY2d 127 [1997]). Contrary to Supreme Court's reasoning, the "commercial background of both parties" is of no moment (*id.* at 132 ["the plain language of Domestic Relations Law § 236 (B) (3) . . . recognizes no exception to the requirement of formal acknowledgment"]).

Nor can defendant be held liable for repayment of the loans on the alternative ground that he, as Supreme Court wrote, "ran the corporations [CDL and a related entity] as his alter ego, while disregarding corporate forms." Neither CDL nor the related entity, after all, were made parties to this action (*see Stewart Tenants Corp. v Square Indus.*, 269 AD2d 246, 248 [1st Dept 2000] ["An action to pierce the corporate veil requires that the purported dummy corporations be parties, even if the parent corporation is alleged to be the one which unjustly retains the funds"]; *see also Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 144 [1993] ["to pursue (the individual) under the doctrine of piercing the corporate veil presupposes that the corporation is liable" (internal quotation marks omitted)]). Our decision in *Goldberg v Goldberg* (172 AD2d 316 [1st Dept 1991], *lv dismissed* 78 NY2d 1124 [1991]) is not to the contrary; the husband was not held liable for any obligations of the "alter ego corporations" (*id.* at 316) on account of his misuse of those entities. We need not determine whether defendant also is correct in urging that plaintiff failed to show that he perpetrated a wrong against her through his alleged domination of the corporate entities (*see id.* at 316-317).

Using the income capitalization method of valuation, the neutral expert valued CDL as of the commencement date of the action at $1.3 million; defendant's expert did not dispute the reasonableness of this valuation or the methodology. The court found that the fair market value of CDL was $1.3 million and that plaintiff was entitled to a distributive award of 40% of its

total value or $520,000. As defendant correctly maintains, however, the parties collectively owned 85% of CDL, with third parties owning the rest. Accordingly, the value of this marital asset should have been fixed at $1,105,000 (85% of $1.3 million), and the CDL component of the distributive award to plaintiff should have been $442,000 (40% of $1,105,000). To correct this oversight, we reduce the distributive award to plaintiff by $78,000.

The neutral expert valued two other marital assets related to CDL: the CDL "Directors' Loan Account," representing, as the court stated, "money advanced to CDL" (by plaintiff, defendant and another CDL-related entity), and Calitalia, an entity founded by defendant that served as a vehicle for charging defendant's annual management fees to CDL. The expert valued the Directors' Loan Account at $330,000 and Calitalia at $620,400. The valuation of Calitalia reflected the book value of its sole asset, the receivable from CDL for accumulated unpaid management fees, after discounts to account for both the possibility CDL would be unable to pay and taxes Calitalia would owe if CDL did pay. However, because it found that defendant's expert "was persuasive in his testimony that the value of CDL already included the Directors' Loan Account," the court "d[id] not attribute a separate value to the Directors' Loan Account." Accordingly, with respect to the Directors' Loan Account and Calitalia, the court ruled that the amount of the distributive award to which plaintiff was entitled was $248,160, 40% of the value of Calitalia.

We agree with Supreme Court that the reasoning of defendant's expert is persuasive. We also agree with defendant, however, that his expert's reasoning applies with equal force to Calitalia, and for this reason we reduce the distributive award to plaintiff by $248,160. As defendant's expert explained, the $1.3 million valuation of CDL makes sense only if both "liabilities" of CDL are reclassified as CDL equity and subsumed within the $1.3 million valuation. Only on that basis would the debt to equity ratio of CDL justify the capitalization rate that the neutral expert employed, a rate that is essential to the $1.3 million valuation. That valuation, as defendant's expert testified, "encompasses all the assets and all [the] liabilities of CDL . . . includ[ing] what we know as due to . . . shareholders, called the Directors' Loan[A]ccount, and the payable to Calitalia." Thus, the separate valuation of Calitalia reflects

what amounts to a form of double counting.* Without recapitulating every aspect of the reasoning of defendant's expert, we note that we also find persuasive his testimony that a hypothetical buyer of CDL would not pay $1.3 million for it if it were obligated to pay off the "liability" to Calitalia over a five-year amortization period. If CDL were so obligated, there would not be nearly enough cash flow both to pay Calitalia and provide the buyer with a reasonable return on investment. Relatedly, moreover, in computing the annual after-tax profit of CDL, the neutral expert did not allow for an expense attributable to CDL's payment of the accumulated management fees. We also note that Supreme Court's disparate treatment of Calitalia and the Directors' Loan Account may reflect a misrecollection of defendant's position, the expert's testimony or both. In its written decision, after all, the court stated that defendant valued Calitalia at $620,400, and made no mention of either defendant's expert's testimony that Calitalia's value should be included in the value of CDL or any tension between its treatment of Calitalia and the Directors' Loan Account.

As noted earlier, the parties' right to repayment of the loans to CDL is a marital asset. At this juncture, we can more easily explain our determination not to remand for the purpose of further proceedings to value this asset. In the first place, plaintiff has not asked that we direct such a remand in the event we agree with defendant that it is a marital asset. Second, we cannot perceive any rational basis for treating this asset differently than Calitalia and the Directors' Loan Account, i.e., for concluding that its value should not be subsumed within the value of CDL. Third, because it appears that the value of CDL would have to be reduced in the event this asset were to be separately valued, we doubt that any net benefit flowing to plaintiff, the party with the greater equitable share of both assets, would compare favorably with the costs of further proceedings in this already costly and protracted litigation (*see Wechsler v Wechsler*, 58 AD3d 62, 78 [1st Dept 2008], *appeal dismissed* 12 NY3d 883 [2009]).

The court found both that the value of plaintiff's brokerage account as of the commencement of the action was $1,691,673.51 and that the increase in value of the account during the marriage, $528,022, was marital property. Without explanation, however, the court failed to make any equitable distribution of this marital asset to defendant. We agree with defendant that

---

* In other words, if it were appropriate to value Calitalia separately, the value of CDL would have to be reduced because of its liability to Calitalia by an amount greater than the amount of the discounted value of Calitalia.

this was error (*see* Domestic Relations Law § 236 [B] [5] [c]). And, as already discussed, we also agree with defendant that, because of the commingling in the brokerage account of plaintiff's separate property with other property acquired during the marriage, the entire account should be deemed marital property. We disagree, however, with defendant that he should be awarded the same percentage share of this account, i.e., 30%, that the court awarded him of the other marital property acquired through plaintiff's direct efforts. On the facts of this case—including plaintiff's proof of the value of the brokerage account at the time of marriage, the appreciation of the securities due to passive economic forces, the substantial gifts during the marriage to plaintiff from her parents, the substantial sums from the account advanced directly to CDL and the evidence that, as Supreme Court aptly stated, "plaintiff not only was the financial engine of this marriage, but . . . was also the primary caretaker of the parties' son"—we find that an award of 15%, or $253,751, of the total value ($1,691,673) of this marital asset is appropriate.

Because the parties bought the New York townhouse in July 2000 and defendant moved out of the house in April 2001, the court erred in awarding defendant only five months' worth of the appreciation on the value of the house. Accordingly, we award defendant nine months' worth of appreciation, as indicated.

The dissent is unpersuasive in contending that plaintiff's mere ability to value the brokerage account as of the commencement date is sufficient to entitle her to retain as her separate property an amount equal to that commencement date value. The dissent relies on inapposite decisions and ignores the trading activity that occurred during the course of the marriage and the deposits of substantial sums representing marital property during the marriage as well as the fungibility of money. Notably, in her brief, plaintiff does not refer us to any pages of the 10-volume record on appeal that reflect efforts to trace over the course of the marriage the property in the account at the commencement date. The dissenter, who authored the majority's opinion in *Fields v Fields* (65 AD3d 297 [2009]), fails to recognize that the brokerage account is marital property for the same reason the bank account in that case was marital property: "because the husband commingled numerous marital funds in this account and failed to trace them sufficiently to delineate what might have been separate property" (*id*. at 302 n 3).

Nor is the dissent persuasive with respect to the loans relating to CDL. By way of a brief response, suffice it to say that it is

undisputed that the loans made prior to the marriage were repaid. Presumably, the dissent agrees they need not be repaid again. With respect to loans made during the marriage, characterizing them as loans to defendant recognizes an unacknowledged agreement that makes "provision for the ownership, division or distribution of separate [or] marital property" in violation of Domestic Relations Law § 236 (B) (3). The dissent believes that equitable principles permit the corporate veil to be pierced to hold defendant personally responsible for repayment of the loans even though CDL is not a party. The dissent, however, cites no authority for the proposition that equitable considerations permit plaintiff to do indirectly what she cannot do directly because of the bar of Domestic Relations Law § 236 (B) (3). Nor does the dissent cite any authority recognizing an equity-based exception to the rule requiring the corporate entity to be a party. We note, too, that by holding defendant personally liable on a piercing-the-corporate-veil theory, the dissent would confer a windfall on the minority owner of CDL.

We have considered defendant's remaining contentions and find them unavailing. Concur—Friedman, J.P., McGuire, DeGrasse and Freedman, JJ.

Acosta, J., dissents in part in a memorandum as follows: I respectfully dissent on two issues: first, I would find in plaintiff's favor on her cause of action for repayment of the loan; and second, I would award defendant a percentage only of the appreciation of plaintiff's brokerage account during the parties' marriage.

The parties were married on December 11, 1994. At the time of the marriage, plaintiff had had an unusually successful career; she was employed at US Trust Company as a managing director and was the youngest person ever to attain that position at US Trust. For his part, beginning in the late 1980s and early 1990s, defendant was a wine broker and owned two wineries, one of which was sold and the other of which eventually went bankrupt.

In February 1994, less than one year before the parties married, defendant established California Direct, Ltd. (CDL), which was in the business of providing California wines to European grocery chains. Defendant was the managing director of CDL, and the initial investors in the company were plaintiff, defendant, defendant's brother, and a British investor, the last of whom gave his share to his children, who eventually owned 15%. Defendant also owned a company called Namrok Holding Corporation, which he solely organized and wholly controlled. The parties never filed joint income tax returns.

When Namrok was formed, defendant used that corporation to collect management fees and receive any money that CDL loaned or paid to him. In 1996, however, defendant stopped using Namrok for that purpose and instead formed another corporation, Calitalia, Inc. Like Namrok, Calitalia was organized and wholly controlled by defendant. As he had with Namrok, defendant used Calitalia as a pass-through entity to receive fees from CDL for the time defendant spent on CDL's business, and to pay certain administrative expenses. At the time of this action, Namrok still existed, but had completely stopped operating.

According to plaintiff, between September 1994 and March 1999, she loaned defendant a total of $2,799,500, with $300,000 of the loan made before the parties were married. Although plaintiff conceded that defendant had repaid $1,000,000 of the principal amount, she argued that he still owed her $1,799,500 of the principal, plus interest. Defendant, on the other hand, maintained that any loans were made not to him as an individual, but to the corporate entities that he controlled, and thus, that he could not be held personally liable for them. Defendant also claimed to have invested $300,000 in CDL before the marriage; however, as the trial court noted, defendant never adduced credible evidence of his investment.

On March 15, 2001, several months after plaintiff discovered that defendant was having an extramarital affair, defendant, at plaintiff's behest, signed a document entitled "Summary of Notes Due to [Plaintiff]" (the written guaranty). The written guaranty purported to secure defendant's repayment of "the aforementioned amounts advanced as described above and confirm the terms and obligation to guarantee payment for the portion outstanding as of this date." The amounts due totaled $2,891,738. Although defendant signed the written guaranty and made certain handwritten changes to the preprinted language, it was not acknowledged in the manner required for a deed, as required by Domestic Relations Law § 236 (B) (3).[1]

I disagree with the majority that defendant is not liable for repayment of monies to plaintiff. First of all, under the circumstances presented, the relevant issue in this case is not whether

---

**1.** Defendant did not object to the written guaranty's admissibility when it was introduced into evidence, although he did, in a written posttrial submission, challenge the written guaranty's enforceability under *Matisoff v Dobi* (90 NY2d 127 [1997]). However, even assuming that defendant failed to preserve at the trial court level the issue of the written guaranty's enforceability, the issue is purely one of law that we may properly consider for the first time on appeal (*see Public Serv. Mut. Ins. Co. v Zucker*, 225 AD2d 308, 309 [1996]).

the loan is marital property, but whether defendant should become entitled to the repayment of a loan on which he himself agreed to be liable for repayment. The majority's conclusion essentially amounts to an argument that the loan arrangement, which was made before the parties' marriage, was at least partially cancelled upon the marriage by dint of plaintiff's actually making the agreed-upon loans to defendant pursuant to the prenuptial agreement. The majority's conclusion, therefore, essentially penalizes plaintiff for abiding by the parties' agreement. This conclusion also leads to the incongruous result that defendant becomes entitled to repayment of the very loan that he agreed to receive from plaintiff before they were married.

*Sagarin v Sagarin* (251 AD2d 396 [1998]), cited by the majority, does not stand for any proposition to the contrary. In *Sagarin*, the court found that "certain loans made by the husband to the corporation . . . should be classified as marital property, inasmuch as the husband failed to demonstrate that the loans were not made with marital funds" (*id.* at 396). However, in *Sagarin*, there is no indication that the loans were the subject of a premarital agreement between the parties; rather, the facts indicate that the loans were simply made to the corporation—which was itself marital property—during the marriage. By contrast, the parties in this case had an agreement that predated the marriage.

Furthermore, the majority characterizes as "[n]otabl[e]" the trial court's finding that the parties' California beach house and the Manhattan townhouse were both marital assets because the parties bought them during the marriage with the use of funds from plaintiff's brokerage account. However, the trial court's finding in that regard is not inconsistent with its finding on the loan issue. On the contrary, the joint ownership of the houses is governed by the unremarkable rule that property acquired during the marriage is generally assumed to be marital property, even where, as here, the title remains in the name of one of the spouses (Domestic Relations Law § 236 [B] [1] [c]; *see Mesholam v Mesholam*, 11 NY3d 24, 28 [2008]). The court also found, with respect to the houses, that defendant involved himself in the process of locating and furnishing them, contributed to their upkeep, paid for ancillary services, and contributed to some of the costs of maintaining them—another reason for its finding that the houses were marital property and the loans were not.

I also conclude, contrary to the majority, that CDL's corporate veil can be pierced and that defendant can be held liable for repayment on the loans on that basis.

To begin, I disagree with the majority that plaintiff's effort to

recover the loans must be denied because she failed to join the corporations as a party to this matrimonial action. As the majority accurately notes, in *Stewart Tenants Corp. v Square Indus.* (269 AD2d 246 [2000]), this Court held that an action to pierce the corporate veil requires that the controlled corporation be named as a defendant in the action. However, *Stewart* was not a matrimonial action. Incorporating to avoid personal liability to creditors is, without question, permissible under New York law (*see e.g. Ventresca Realty Corp. v Houlihan*, 28 AD3d 537, 538 [2006]). The policy behind this rule makes perfect sense in the context of business and corporate law—it allows for entrepreneurship and risk-taking without the risk of personal liability to the entrepreneur. This policy, of course, differs markedly from the policy behind equitable distribution, namely, the distribution of property upon divorce in a manner that treats the marriage as an economic partnership (*Price v Price*, 69 NY2d 8, 14-15 [1986]).

And in fact, no New York court appears to have held that one may use incorporated status to avoid personal liability to one's spouse. Indeed, allowing defendant to do so is particularly inequitable here, where defendant testified that CDL paid for many of the couple's personal expenses, such as the rent on the parties' residence in New York and parking for the parties' car. In light of his testimony that many payments from CDL were of a personal nature, used to pay for daily expenses of the couple's marriage, defendant should not now be heard to say that CDL and Namrok were separate entities against which plaintiff must commence an action separate from the matrimonial action. That defendant's actions occasionally benefitted both spouses does not serve to change this result, since the issue is not who benefitted, but which party seeks to use the corporate form to avoid repayment of loans—in this case, defendant.

Certainly, this conclusion is not without precedent. For instance, in *Goldberg v Goldberg* (172 AD2d 316 [1991], *lv dismissed* 78 NY2d 1124 [1991]), no corporation was joined as a party to the matrimonial action. Nevertheless, this Court affirmed a distributive award to the wife as her share of the marital property after finding that the husband had deliberately dissipated and secreted marital assets by conveying them to various trusts and alter ego corporations. This Court found that because those entities served as the "defendant's personal 'pocket book,'" it was necessary to make a "distributive award to the plaintiff of her share of the marital property, in lieu of equitable distribution, so as to achieve an equitable result in the distribution of that property" (*id.* at 316-317).

Although the majority correctly notes that the husband in *Goldberg* was not held liable for any obligations of the alter ego corporations on account of his misuse of those entities, this observation misses the mark, as *Goldberg* held that a party may not evade payment to his spouse through use of the corporate form. At any rate, the majority's conclusion fails to account for the equitable principles, set forth above, that govern this proceeding, namely, that defendant, having brought the corporation into the marriage, may not, at the same time, hide behind the corporation to avoid liability to plaintiff, his former spouse. The equities are particularly strong in this case, where plaintiff was not merely a party whose spouse controlled a corporation, but rather, according to the neutral expert's report, the largest source of funds to that corporation (*see Ventresca Realty Corp. v Houlihan*, 28 AD3d 537 [2006]).

As to whether defendant used his domination of the corporate form to perpetrate a wrong against plaintiff, an issue that the majority does not reach, there is no dispute that defendant controlled CDL, Calitalia, and Calitalia's predecessor entity Namrok—indeed, defendant so testified, stating, for example, that a debt owed to Calitalia was, in reality, a debt owed to him. To be sure, the record shows a nearly complete unity of interest between defendant and his various corporate entities. Additionally, the record makes clear that defendant did, in fact, use his domination of these entities to commit a wrong against plaintiff and that the wrong caused her harm. For example, defendant conceded that in 1997, he signed a document on behalf of Namrok, unilaterally assigning a receivable that Namrok owed to plaintiff. The result of the assignment was that the transaction was recast so that CDL owed the receivable to plaintiff and defendant, rather than to plaintiff alone. Similarly, defendant testified that without plaintiff's consent, he made himself her agent with respect to that transaction. Defendant also conceded that he had written down at least part of plaintiff's loan account by the amount of personal expense reimbursements that he was receiving from CDL. These transactions, which were effected solely through defendant's domination of the corporate entities, inflicted substantial financial injury on plaintiff (*see Teachers Ins. Annuity Assn. of Am. v Cohen's Fashion Opt. of 485 Lexington Ave., Inc.*, 45 AD3d 317, 318 [2007]; *Fern, Inc. v Adjmi*, 197 AD2d 444, 445 [1993]).

It is also difficult to understand why the majority believes itself compelled to accept the framework that defendant now offers—that is, the one set forth under *Matisoff v Dobi* (90 NY2d 127 [1997], *supra*) and Domestic Relations Law § 236 (B) (3)—

rather than the one he himself offered at trial.[2] Indeed, defendant did not even raise the written guaranty's enforceability until his posttrial submission, choosing instead to argue at trial that, among other things, he was a mere guarantor of the loans to CDL and that plaintiff could not recover the loans because she had failed to join the corporations as parties. Since defendant chose to use the corporate form as his shield at trial, this Court should not allow him to now reject that same reasoning when used as a sword.

Next, I agree with the majority that the court erred when it neither equitably distributed the marital portion of the brokerage account nor stated any reason for not doing so. I disagree, however, that *Kirshenbaum v Kirshenbaum* (203 AD2d 534 [1994]) and *Pullman v Pullman* (176 AD2d 113 [1991]), cited by the majority, lead to the conclusion that, because of the commingling in the brokerage account of plaintiff's separate property with other property acquired during marriage, the entire brokerage account should be deemed marital property.

Despite the majority's broad reading of *Pullman* and *Kirshenbaum*, neither case stands for the proposition that a separate account is wholly converted into marital property when the titled party deposits funds acquired during the marriage. Rather, those cases stand for the proposition that where property is acquired during the marriage, the acquired property is presumed to be marital property unless one party can adequately trace the acquisition to separate funds (*see Pullman*, 176 AD2d at 114; *Kirshenbaum*, 203 AD2d at 535). Indeed, we tacitly conceded in *Pullman* that had the husband provided "clear proof" that he possessed separate funds and acquired the parties' property with the separate funds, the acquired property would have been held to be separate, not marital (*Pullman*, 176 AD2d at 114).

Of course, while commingling of premarital assets with marital assets creates a presumption that the separate property has become marital property, such a situation usually arises where separate property is deposited into a joint, marital account, not the other way around, as defendant asserts was the case here (*see e.g. Judson v Judson*, 255 AD2d 656, 657 [1998]). By

---

**2.** *Matisoff*, incidentally, addressed a situation in which the parties agreed, in a postnuptial agreement, that " 'neither party shall have nor shall such party acquire any right, title or claim in and to the real and personal estate of the other solely by reason of the marriage of the parties' " (*id.* at 130). The agreement in this case, by contrast, concerns loans that, according to defendant, need not be paid back, and in fact, must be repaid to him as well as to the lender.

actively putting separate property in a joint account, it is presumed that the party doing so intended to make a gift of the separate property to the other spouse. As the cases hold, however, this presumption can be rebutted (*see Lagnena v Lagnena*, 215 AD2d 445, 446 [1995]).

In this matter, the documents that plaintiff produced during discovery demonstrated that the value of the brokerage account, which was solely in plaintiff's name, totaled $1,163,652 as of the date of the marriage. This evidence is, under the circumstances, sufficient to rebut the presumption that $1,163,652 in the brokerage account is marital property (*see Sarafian v Sarafian*, 140 AD2d 801, 804 [1988]; *Heine v Heine*, 176 AD2d 77, 83-84 [1992], *lv denied* 80 NY2d 753 [1992]). The brokerage account's value as of this action's commencement was $1,691,673.51—an appreciation of $528,022. As a result, the trial court should have awarded defendant the same 30% share that it awarded him of the other marital property—that is, $158,406.60, representing 30% of $528,022.

The majority is critical of this reasoning, and, to rebut it, refers to the majority opinion in *Fields v Fields* (65 AD3d 297 [2009]). In *Fields*—an appeal for which I wrote the majority opinion—this Court noted that a certain account at Citibank "was marital property because the husband commingled numerous marital funds in this account and failed to trace them sufficiently to delineate what might have been separate property" (*id.* at 302 n 3).

*Fields*, however, neither contradicts the reasoning that I have set forth above nor supports the current majority's conclusion. On the contrary, the majority ignores an important distinction between this case and *Fields*: in *Fields*, the plaintiff husband and his mother opened the Citibank account some 12 years after the parties' marriage and then, upon the parties' divorce, claimed that his portion of the account was his separate property. In marked contrast, plaintiff in this case, who was the monied spouse, entered the marriage with $1,691,673.51 in the brokerage account—money that was, incontrovertibly, hers and hers alone. Neither party to this action disputes the amount contained in plaintiff's brokerage account at the beginning of the marriage; indeed, to do so would fly in the face of the documentary evidence. That plaintiff deposited marital funds into the brokerage account does not serve to automatically transform clearly separate property into marital property. To be sure, as I have noted, no case that the majority cites stands for the proposition that placing marital funds into an account existing before the marriage destroys the separate character of preexisting premarital funds.

Finally, I agree with the majority that the trial court erred when it awarded defendant only five months' worth of the appreciation on the value of the New York townhouse, as defendant moved out of the house in April 2001, not, as the trial court mistakenly found, in December 2000. I also agree with the majority that because the parties owned only 85% of CDL, with the rest being owned by third parties, the distributive award to plaintiff should be reduced by $78,000.